UNITED STATES, Appellee,

v.

Robert A. PEARSON, Corporal, U.S. Marine Corps, Appellant.

No. 44213.

NMCM 81 1258.

U. S. Court of Military Appeals.

Jan. 30, 1984.

For Appellant: *Lieutenant Ann D. Carroll, JAGC, USNR* (argued); *Commander Matthew J. Wheeler, JAGC, USNR* (on brief); *Lieutenant Colonel M.W. Lucas, USMC.*

For Appellee: *Lieutenant William V. Cerbone, Jr., JAGC, USNR* (argued); *Commander W.J. Hughes, JAGC, USN* (on brief); *Major Charles Wm. Dorman, USMC.*

*Opinion of the Court*

COOK, Judge:

A general court-martial with members convicted appellant, contrary to his pleas, of negligent homicide, a violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. Appellant was sentenced to a bad-conduct discharge, confinement at hard labor for 1 year, total forfeitures, and reduction to pay grade E–1. The convening authority approved the sentence, and the United States Navy-Marine Corps Court of Military Review affirmed. *United States v. Pearson,* 13 M.J. 922 (1982). This Court granted review of two assigned issues:

I

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING GUNNERY SERGEANT LOCKE AND MR. ROGER LEROY TO TESTIFY IN AGGRAVATION?

II

WHETHER THE MILITARY JUDGE ERRED IN ALLOWING EXCERPTS OF THE VICTIM'S SERVICE RECORD BOOK AS EVIDENCE IN AGGRAVATION?

A

The incident arose at an enlisted club at the Marine Corps Air Station, El Toro, California. The victim, Lance Corporal Ryan Leroy, was talking to a woman friend when appellant, a stranger, walked over to them and propositioned the woman. A brief argument ensued, and the victim shoved appellant away. What happened next was keenly disputed at trial. The defense witnesses' testimony suggested that appellant fell against a table and was promptly struck in the jaw by an unknown assailant. As appellant staggered back from this blow, three or four of what appeared to be the victim's friends converged upon appellant. Instinctively, appellant grabbed a chair, tossed it underhanded at the array, and made good his escape. According to appellant, the chair may have traveled twelve to fifteen feet through the air and reached a maximum height of about six feet. Appellant testified that he did not see the chair strike the victim.

The prosecution's evidence suggested that, after the victim pushed appellant, the victim turned away to look after his female friend. While the victim was thus occupied, appellant picked up a chair with both hands, cocked it over his shoulders, strode towards the victim, and smashed the chair against the side of the victim's head. Not seeing what was coming, the victim made no attempt to block the chair. According to the prosecution witnesses, it was only after the impact that bystanders interceded.

Whatever the scenario, there is no question but that the victim died as a result of the blow. Appellant was initially charged with murder, but the findings indicate that the court members were only persuaded, beyond a reasonable doubt, that appellant committed a negligent act.

After findings, the prosecution informed the military judge that it had matters to present in aggravation of sentence. Civilian defense counsel objected, citing paragraph 75, Manual for Courts-Martial, United States, 1969 (Revised edition), contending that such aggravating evidence was only admissible after a plea of guilty.[1] Further, counsel argued that, even if relevant and admissible, the evidence that was about to be admitted was prohibited under Mil.R.Evid. 403,[2] as its probative value was "very tenuous." After receiving trial counsel's proffer of the expected evidence, the military judge overruled defense counsel's objection. Thereafter, consistent with the proffer, Gunnery Sergeant Scott Locke testified, as a prosecution witness, that he was "line division chief" for a Marine fighter attack squadron and that the victim worked for him as a "plane-captain trainee." Locke's testimony on direct examination proceeded as follows:

Q. . . . Could you please describe to the court, in your own words, what your opinion of Ryan LEROY was as an overall Marine?

A. Yes, sir, I will. Since Lance Corporal Ryan LEROY, coming aboard this station and joining my squadron as a TME, a trainee for—to become a plane-captain, I have never, during the 12 and a half years that I've been in the Marine Corps, met an individual that was so eager to learn, cool-headed on the job, and able to handle responsibilities in the manner that Lance Corporal Ryan LEROY was able to do so. He was a great worker, he was loyal, consistent, hard-working, just a definite asset both to the squadron and to the Marine Corps.

Q. Was it his intentions—or do you know what his intentions were with regards to a career in the Marine Corps?

A. The few times that we discussed career-length options, he had made it known that he would like to stay on

1. We have subsequently rejected this contention in *United States v. Marshall,* 14 M.J. 157 (C.M.A.1982), and *United States v. Vickers,* 13 M.J. 403 (C.M.A.1982).

2. Mil.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

active duty within the Marine Corps for a career, his only doubts being whether to stay in as an enlisted man, or to go into an officer's training program.

Q. Gunny, approximately how many enlisted are in that squadron?

A. Approximately 240 together with our personnel that we have FAP'd out at any one time.

Q. To the best of your knowledge—well, are the majority of those members of the squadron aware of this court-martial?

A. Yes, sir, they are.

Q. What has the impact been on the squadron, with the death of Lance Corporal Ryan LEROY?

A. The—immediately upon the death of Lance Corporal LEROY, it seemed as though the whole squadron had been shaken apart. We couldn't understand how such a tragedy could come to take place within the command, and in the senseless way that it did. *Since his death, and from that date to this, the whole squadron has been waiting to find out the verdict of this court, and to see how his killer was going to be treated.*

TC: No further questions.

(Emphasis added.)

Defense counsel declined to cross-examine, and no objection was lodged concerning the content of Locke's testimony. The trial judge gave no cautionary instructions regarding Locke's testimony, nor was he asked to do so by any party.

The victim's father, Mr. Roger Leroy, was also asked to "tell the court exactly what type of person Ryan LEROY was as a whole man?" The following responses were elicited:

A. I guess I could put a lot of it into one explanation. I told my wife, after Ryan died, that if—if I was an architect and I was going to draw up a blueprint of a perfect son, I'd use Ryan as the example. This man, sitting here, so long as he lives, will never know what he took away from us. There is no son that a man could ever have that had more compassion, con-

trol, self-confidence—excuse me just a minute.

TC: I would request a brief recess, Your Honor.

MJ: A brief recess would be in order—

WITNESS: It's—it's not—a recess isn't necessary. Just let me hesitate just a minute, please.

Q. Mr LEROY, what's the impact of Ryan's death been on the community of Reeseville?

A. The only word that I can use, that doesn't even describe it, is devastating. I don't know—*I've been sitting over there trying to think how I can go back home, how I can call my wife tonight, and how I can go back home to Reeseville, and tell them that the verdict was negligent homicide.*

MJ: The court will stand in recess for 10 minutes. Right now.

(Emphasis added.)

During the Article 39(a)[3] session that followed, the military judge expressed his sincere sympathy with the witness, but emphasized that it was his responsibility to see that the trial was conducted in a fair and impartial manner. Accordingly, he admonished the witness that,

[e]ven though you have been aggrieved beyond all comprehension, I can not permit you or anyone else to criticize the verdict of this court-martial and suggest to them in any way that they have reached the wrong verdict. This is so, even though you have a greater interest at stake in this case than any other person alive. It pains me to say this to you, but I can not allow this court to be influenced or swayed by emotional considerations. This is my duty, and I must do it. Do you have any questions, Mr. LEROY?

The witness apologized to the judge for his inadvertently critical comments and explained that, being the victim's father, it was difficult for him to accept the decision of the court-martial; but being a member of society, he fully intended to. Neither the parties nor the court-martial elected to

---

3. Uniform Code of Military Justice, 10 U.S.C. § 839(a).

question the witness further, and the defense did not object to the content of Mr. Leroy's testimony. No cautionary instructions were given to the members regarding Mr. Leroy's testimony, and none were requested.

Trial counsel also introduced, in accordance with his proffer, a copy of the victim's Service Record Book, which reflected, *inter alia,* exceptionally high ratings in military proficiency and conduct.

## B

These facts present a case of first impression in this Court. Previously, evidence in aggravation of sentence has been confined to such areas as information about an accused's past, the scope of his conduct during the crime, or the extent of harm done to the immediate victim. *E.g., United States v. Marshall,* 14 M.J. 157 (C.M.A.1982); *United States v. Mack,* 9 M.J. 300, 316 (C.M.A. 1980); *United States v. Mamaluy,* 10 U.S.C. M.A. 102, 105–07, 27 C.M.R. 176, 179–81 (1959). What distinguishes this case from previous cases is the fact that the Government was permitted to introduce independent evidence that the victim was an outstanding person and Marine, and that his family and community were devastated by his loss.

But while this case presents a new subject for this Court, other jurisdictions have seen a profusion of legislation and activity on behalf of crime victims. In the main, to be sure, the new legislation seems to focus primarily on victim compensation. *See* Annot., 20 A.L.R. 4th 63 (1983); Hoelzel, *A Survey of 27 Victim Compensation Programs,* 63 Judicature 485 (May 1980). However, with passage of the Victim and Witness Protection Act of 1982, Pub.L. No. 97–291, a broad range of victim-oriented services and considerations has been formally interjected into the Federal criminal process. *See Attorney General's Guidelines for Victim and Witness Assistance,* 33 Cr.L. 3329 (1983).

Of particular significance is the fact that the Act requires that a "victim impact statement" be included in all Federal presentence reports. Accordingly, Fed.R. Crim.P. 32(c) now provides that:

(2) Report.—The presentence report shall contain—

\* \* \* \* \* \*

(C) information concerning any harm, including financial, social, psychological, and physical harm, done to or loss suffered by any victim of the offense.

According to S.Rep. No. 97–532, 97th Cong., 2nd Sess. 13, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2515, 2519, the definition of victims was purposely made broad enough "to include other 'indirect' victims such as family members of homicide victims."

However, the Senate Judiciary Committee considered the following testimony of the Chief United States Probation Officer for the district of Maryland, Paul R. Falconer, and the Senior Judge for the same district, the Honorable Edward S. Northrop, important enough to include in their report:

The victim of an offense has no standing in the Court beyond the status of a mere witness—he has no right of allocution and is often overlooked in the process of plea negotiation. Our position is that we should not prosecute, try, and sentence any defendant without at least listening to the victim's offense-related needs. It is essential that a victim impact statement be factual and confirmed; *it must be non-inflammatory and non-argumentative. We never want to be guilty of waving the bloody shirt; neither are we to bury the bloody shirt with the victim still in it.*

*Id.* at 2517 (emphasis added).

Of course, the sentencing procedure in the military is governed by paragraph 75, Manual, *supra,* and is considerably different from that employed in Federal courts. Unlike the Federal courts, servicemembers are not always sentenced by judges, presentence reports are not prepared, and adversarial evidentiary hearings are the exclusive mode for the presentation of evidence relevant to sentencing. Nevertheless, we agree that courts-martial, like their civilian-judge

counterparts, can only make intelligent decisions about sentences when they are aware of the full measure of loss suffered by all of the victims, including the family and the close community. This, in turn, cannot be fully assessed unless the court-martial knows what has been taken. Thus trial judges, in their sound discretion, may permit counsel to introduce evidence of the character of the victim. This is not to imply that the life of a victim who is unloved or unappreciated by his community is any less precious than that of a pillar of society. It is simply a recognition that the actual extent of damages inflicted by a criminal can be brought to the attention of the sentencing body.

Of course, the very differences in our sentencing procedures present unique challenges to military judges in maintaining the necessary environment of fairness and objectivity in the courtroom. Even relevant evidence must be excluded if its tendency to inflame the passions of the court exceeds its probative value. Mil.R.Evid. 403. Emotional displays by aggrieved family members, though understandable, can quickly exceed the limits of propriety and equate to the bloody shirt being waved. On the other hand, substantially the same information, in factual, written form such as a presentence report or, here, the victim's Service Record Book, provides little inflammatory risk.

On this record, though we think it a close case, we are not persuaded that the military judge abused his discretion as to the extent of evidence permitted concerning the victim's character and the magnitude of loss felt by his family and community. However, in two respects we conclude that the prosecution witnesses' testimony so blatantly invaded the province of the court members that curative instructions were required, notwithstanding the lack of specific objection by defense counsel. *See* Mil.R. Evid. 103(d).

In the military justice system, the court-martial alone is entrusted with the responsibility of representing the community in arriving at an appropriate sentence for an accused. Just as the supposed expectations of a convening authority may not be brought to bear on a court-martial (*see* Article 37(a), UCMJ, 10 U.S.C. § 837(a)), neither can the alleged desires of society or any particular segment of society be allowed to interfere with the court's independent function, for it is the court-martial alone that has seen the evidence and must make the decisions. Thus when the victim's father unwittingly commented on the findings of the court, and when Gunnery Sergeant Locke implied, however unintentionally, that the entire unit was hanging on the outcome of the trial, this fundamental sanctity of the court-martial was violated. To his credit, of course, the trial judge immediately recognized the impropriety of the father's testimony. However, it was not enough to admonish the witness that such commentary was inappropriate; the court members had to be told as well.

In other circumstances, depending on the sentence adjudged, we might have been able to conclude that an accused was not prejudiced. However, in this case, the literal maximum punishment for the offense of which appellant was convicted was adjudged. Hence, it is impossible for us to state with certainty that appellant was not prejudiced as to sentence. Recognizing that appellant has long since completed his sentence to confinement at hard labor and in the interest of judicial economy, we conclude that the record of trial should be returned to the Court of Military Review for reassessment of the sentence in light of the foregoing errors.

Accordingly, the decision of the United States Navy-Marine Corps Court of Military Review as to sentence is reversed. The record of trial is returned to the Judge Advocate General of the Navy for submission to that court for reassessment of the sentence.

Chief Judge EVERETT and Judge FLETCHER concur.