UNITED STATES, Appellee,

v.

Leroy S. FONTENOT, Private, U.S. Army, Appellant.

No. 60,577.
CM 8701490.

U.S. Court of Military Appeals.

Sept. 29, 1989.

For Appellant: *Captain Jon W. Stentz* (argued); *Colonel John T. Edwards* and

Lieutenant Colonel Russell S. Estey (on brief); Lieutenant Colonel Charles A. Zimmerman, Major Eric T. Franzen, Captain W. Renn Gade.

For Appellee: Captain Martin D. Carpenter (argued); Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Captain Donald W. Hitzeman (on brief); Major Daniel J. Dell'Orto.

## Opinion of the Court

EVERETT, Chief Judge:

Despite appellant's pleas to the contrary, a general court-martial of officer members convicted him of rape[1] and sentenced him to a dishonorable discharge, confinement for 40 years, and total forfeitures. Subsequently, the convening authority approved these results, and the Court of Military Review affirmed. 26 MJ 559 (1988). This Court granted review to consider whether the military judge erred on either or both of two occasions during the presentencing hearing in which he admitted evidence over appellant's objection. 27 MJ 460 (1988). We conclude that, in the first instance, he erred prejudicially.

A detailed recitation of the facts underlying the charge is unnecessary for our purposes. Briefly, the Government alleged that appellant had raped a fellow student/soldier shortly after both had reported for advanced individual training at Fort Sam Houston, Texas. In fact, the prosecutrix had just completed in-processing earlier in the day. Although appellant and his victim did not know each other prior to that day, they were among a group of soldiers who drank beer and socialized that evening at the post exchange and at the enlisted club.

Shortly before a scheduled bed-check, the prosecutrix left the club. She was unfamiliar with the post, so she accepted appellant's offer to walk her to her billet, knowing the appellant was in the same company. On the way, however, appellant guilefully led her to an open field with lights on the other side and assured her that it was a shortcut to the company barracks. Instead of securing her safety as promised, appellant forcibly raped her, threatened her further harm if she told anyone of the incident, and then walked away from his traumatized and supine victim.

## I

## A

At trial, appellant presented no witnesses in his defense and did not testify himself. After the members had returned their findings of guilty, the military judge and counsel met outside the presence of the members to discuss a number of objections that had been raised earlier by the defense to various documents that the prosecution sought to use during its presentencing case.

Pertinent to this appeal, defense counsel objected to an exhibit containing over 70 documents from appellant's Installation Detention Facility (IDF) file. Several of the documents were Department of Defense (DD) Form 508s which reflected disciplinary action against appellant for particular infractions during pretrial confinement. Most of the challenged documents, however, were attachments to these records of disciplinary proceedings.

Perhaps, "documents" is a misleading label for much of this material. Indeed, although appellant concedes that the DD Form 508s reflect what he refers to as "minimal due process," many of the other pieces of paper at issue were nothing more than handwritten statements of prison guards—signed but unsworn—setting out alleged observed misconduct by appellant while in confinement.

Responding to the defense objection, trial counsel pointed out that the court in *United States v. Perry*, 20 MJ 1026 (ACMR 1985), held that, subject to the military judge performing "the balancing test of Mil.R.Evid. 403," Manual for Courts–Martial, United States, 1984, "an approved recommendation for a disciplinary action

---

1. Art. 120, Uniform Code of Military Justice, 10 USC § 920.

against a pretrial confinement prisoner duly recorded on an official DD Form 508 is admissible in evidence, in the discretion of the military judge, during the court-martial presentencing proceedings." *Id.* at 1027 (footnote omitted). Relying on RCM 1001(b)(2), Manual, *supra,* the court there reasoned that such evidence "constituted not only evidence of appellant's past military conduct, but also evidence of his past military performance as a military pretrial confinement prisoner, as well as evidence of a disciplinary action taken against the appellant." *Id.* at 1027.

Defense counsel, too, relied on *Perry:* He reminded the judge that the court in that case had cautioned that the balancing test of Mil.R.Evid. 403 must be performed; and he argued that, inasmuch as appellant "has never been given an opportunity to rebut or appeal" the documents attached to the DD Form 508s, it was much too risky under that rule to provide the court members with that kind of unsworn, untested, unreliable, but highly detrimental information.

Ultimately, the military judge "rejected" all of the defense arguments. He concluded that *Perry* controlled admission of the DD Form 508s; that the miscellaneous papers attached to those forms "are important pieces of background information for the court members to consider in deciding on the validity of these disciplinary actions"; and that it would not "be highly prejudicial or unfair [under Mil.R.Evid. 403] for the court members to receive that evidence."

B

 Initially in this Court, the Government urges that we invoke waiver against appellant's complaints regarding admissibility of the bulk of the over 70 documents here at issue. Pointing out that Mil.R. Evid. 403 is the only evidentiary rule cited by defense counsel as a basis for his trial objection, government counsel submits that all other possible objections to admissibility have been waived. *See* Mil.R.Evid. 103(a)(1).

Given the state of the record on the litigation of this objection, however, we decline to view the defense effort at trial as restrictively as does the Government in this Court. Although rules other than Mil.R. Evid. 403 were never expressly cited, it is clear that both counsel and the military judge were aware of the pitfalls of this evidence. For instance, all focused on the *Perry* opinion as applicable—which itself relied on RCM 1001(b)(2). Moreover, defense counsel quite clearly was concerned with the lack of reliability of the documents other than the DD Form 508s in view of appellant's lack of opportunity to "rebut or appeal" the allegations of misconduct contained therein.

Also, contrary to the Government's suggestions during oral argument in this Court that defense counsel's omission to object on other bases had misled the military judge into not fully considering and ruling on those bases, the military judge demonstrated his grasp of the crux of the problem with these tangential documents when he ruled that they were "important pieces of background information" relating to the disciplinary proceedings reflected in the DD Form 508s.

Accordingly, although defense counsel might have set out the precise legal bases for his complaints more artfully, we are satisfied that all parties at trial fully appreciated the substance of those complaints and that the military judge had full opportunity to consider them—which, after all, is what the waiver rule is designed to provide in the first place.

C

 On appeal, as it did at trial, the Government relies entirely on the *Perry* decision as "dispositive" of this issue. As indicated earlier, the court in that case, in turn, relied on RCM 1001(b)(2) for its decision that, subject to the judge performing

the balancing test of Mil.R.Evid. 403, a properly completed and maintained DD Form 508 is admissible as evidence of an accused's "past military ... conduct" and of his "military ... performance" as a military pretrial confinee, as well as evidence of "disciplinary actions" against him. *See* RCM 1001(b)(2).

In this Court, though, appellant does not strenuously resist admissibility of the DD Form 508s. Instead, his complaint is directed, as it was at trial, to the various pieces of paper that accompanied those forms as part of the exhibit—pieces of paper arguably far more damaging to him than were the DD Form 508s. On this point, *Perry* is not "dispositive"; indeed, the court there did not even address the question.

Tellingly, in its brief in this Court, the Government made virtually no effort to defend admissibility of these papers, and it made little additional effort in oral argument. In our view, its reticence is understandable.

RCM 1001(b)(2) does authorize trial counsel, during presentencing proceedings, to introduce evidence of the "character of prior service" of an accused, including "reports reflecting the past military efficiency, conduct, performance, and history of the accused and evidence of any disciplinary actions including punishments under Article 15." However, such evidence must come "from the personnel records of the accused" and "[u]nder regulations of the Secretary concerned."

Thus, the question becomes, do the "regulations of the Secretary concerned" authorize such pieces of paper to be maintained in an individual's personnel records, and do such regulations contemplate that such pieces of paper will be admissible under RCM 1001(b)(2) during presentencing proceedings? Unfortunately for the Government, they do not.

The Army's controlling personnel-records regulation is Department of Army Regulation (AR) 640–10, Individual Military Personnel Records (July 1, 1984) (C11, February 9, 1987). Table 4–1 of that regulation contains a lengthy list of what documents are to be maintained in an individual's personnel records and contains, as well, a detailed description of due-process requirements that are to be met before any records containing adverse information are included. None of the documents to which appellant objected is listed there.

The DD Form 508s are recognized in AR 190–47, The United States Army Correctional System (October 1, 1978) (C2, February 7, 1987). Paragraph 5–5 lists and discusses "[i]ndividual personnel documents regarding prisoner's correctional treatment [that] will be maintained in a file folder separate from personnel records contained in prisoner's DA Form 201 (Military Personnel Records Jacket, U.S. Army) ..." Subparagraph f provides for preparation and maintenance of DA Form 508 in a prisoner's correctional treatment file, but no mention is made there or elsewhere in this regulation regarding the miscellaneous pieces of paper accompanying the DD Form 508s in this case. *"Expressio unius est exclusio alterius," Sutherland Stat. Const. § 47.23 (4th ed. 1984 Revision)*, governs here.

Finally, Chapter 3 of AR 600–37, Unfavorable Information (December 19, 1986), discusses "Unfavorable Information in Official Personnel Files." Paragraph 3–2 articulates the policy that, "[e]xcept as indicated in paragraph 3–3, unfavorable information will not be filed in an official personnel file unless the recipient has been given the chance to review the documentation that serves as the basis for the proposed filing and make a written statement, or to decline, in writing, to make such a statement." Paragraph 3–3 lists a number of exceptions to this policy—documents that "may be filed in the performance portion of the OMPF without further referral to the recipient," such as records of courts-martial and of nonjudicial punishment, pro-

ceedings of boards of officers, records of civilian convictions, and officer and enlisted evaluation reports. None of the documents contained in the complained-of exhibit in this case is listed.

In sum, none of the provisions in the regulations that address personnel files generally or correctional files specifically contemplates inclusion in these files of the bulk of the material at issue in this case. Moreover, Army policy, as reflected in the last-discussed regulation, quite clearly reflects an appropriate sensitivity to the need for some opportunity for the individual to become aware of unfavorable information that will be included in his personnel files and to respond to it. There is no showing that such an opportunity ever was offered appellant as to the documents here, and that precisely was the nature of his objection. Accordingly, the challenged documents[2] were not admissible under RCM 1001(b)(2).[3]

### D

■ We are unable to conclude that there is no fair risk that appellant was not prejudiced by this evidentiary error in sentencing. The misstep caused the court members to consider over 70 pieces of paper describing in detail dozens of instances of bizarre, obscene, or recalcitrant behavior, little of which had any direct connection to the crime for which appellant was to be sentenced. Worse, the pieces of paper are hearsay, not attested to, and not tested

for reliability—in other words, more akin to back-fence gossip than to facially reliable and credible documents.

Moreover, we are aware, too, of the resulting sentence that included 40 years' confinement. Without diminishing one bit the seriousness of the crime and the abhorrent factual circumstances surrounding this particular incident, at the same time we must acknowledge that the length of confinement is somewhat in excess of what might have been expected in the experience of this Court. In light of this, we are unable to satisfy ourselves that the inadmissible documents at issue here did not play some significant role in producing that sentence. Therefore, their admission was prejudicial error, and remedial action is necessary.

### II

### A

Immediately after the defense objection to the documents discussed above was overruled, defense counsel indicated to the military judge that he objected also to the anticipated testimony of the prosecutrix' parents during presentencing. When the military judge asked trial counsel what the parents would say if called, the prosecutor explained:

It is the Government's contention that Mr. and Mrs. Boeringer have valuable information for the sentencing authority inasmuch as the sentencing authority

2. Our decision here is limited to admissibility of the miscellaneous pieces of paper at issue and does not extend to the question of admissibility under the circumstances of this case of DD Form 508: Appellant does not contest the latter point; and, in light of our disposition of the challenge to the other pieces of paper and our determination regarding prejudice, *infra,* it is unnecessary now for us to resolve that question. We do note with interest, though, that government counsel in responding to a question from the Court during oral argument informed the Court that, if a soldier who was *not* in pretrial confinement was to be counseled for conduct similar to appellant's here, likely a DA Form 2823 would be used and that form generally is not admissible as evidence during the prosecution's initial sentencing presentation.

3. Although the Government did not urge RCM 1001(b)(5), Manual for Courts–Martial, United States, l984, "Evidence of rehabilitative potential," as a basis for admission of this material, we note in passing that our recent opinion in *United States v. Wingart,* 27 MJ 128 (CMA 1988), made clear that that rule is not available under these circumstances. There, we observed:

RCM 1001(b)(5) seems to contemplate that "specific instances of conduct" may be inquired into by cross-examination of witnesses who have expressed opinions on the topic but does not authorize extrinsic evidence of uncharged misconduct in order to show the presence or absence of an accused's rehabilitative potential.

*Id.* at 136.

must consider also the impact on the victim. And inasmuch, as the Government contends, they are as much victims as their daughter. They will offer testimony as to the impact of this incident, not only upon their daughter and their perceptions of it, but the impact upon themselves both financially and emotionally. The Government would ask that they be allowed to testify because they have evidence that is worthy and should be considered by the sentencing authority.

Defense counsel then stated his grounds for objecting:

Well, Your Honor, I don't think that the testimony by the parents is going to be rel[evant] and it's going to be emotional. They both sat throughout the trial here in the courtroom and I feel that any testimony which they could offer is going to be an emotional appeal designed to inflame the jury—

After clarifying with defense counsel that his objection was based on Mil.R.Evid. 403, the judge overruled the objection. However, he admonished the prospective witnesses as follows:

All right. Mr. and Mrs. Boeringer, as I have indicated—let the record reflect that the parents of the victim are in the courtroom at this time. As I have indicated to Captain Bennett, I think it important and proper that you be allowed to testify during the presentencing phase of this court-martial. Now, however, I've got responsibilities here as the judge in this case to make sure that these proceedings are conducted in a fair and orderly manner. That means that not only do I have the responsibility to your daughter, but I also have a responsibility to the accused, Private Fontenot, in this case, to make sure that things are done fairly here.

Now I heard what Captain Bennett is going to ask you, and that's basically an impact statement from you as victims, if you will, but I'd like to caution you, and I know that this may be hard for you because of your position as parents here

of the victim, caution you that should I find that things are—or your testimony is becoming too much of an emotional appeal to the court members, then, as I say, I am obligated out of my sense of fairness here to the accused to stop you from testifying should I detect any problem. So, please, I know it may be hard for you because of the facts and circumstances in this case, but I enlist your cooperation in making sure that things are done fairly here.

Thereafter, three witnesses were called by the prosecution. First, Private Boeringer, the prosecutrix, testified concerning the continued impact of the rape on her. She revealed that the incident "is always in the back of my mind and there's time like—that I just—I feel like I'm going to cry and there's nothing that really causes it. It's just—it's there. It's—it's really bothering me a lot." She indicated a need for counseling "because I think that it's something that is really going to bother me for the rest of my life."

Then, the victim's mother testified briefly. She pictured a good mother-daughter relationship with the victim. She testified that, since the incident, her daughter does not associate much with her old friends and that "she is withdrawn now." Even the victim's brother and sister see that she "is not as talkative as she used to be and outgoing like she was." Asked what impact the incident has had on her, the witness responded simply, "Well, I see how she is. It hurts me. It's like it happened to me."

Finally, the victim's father took the stand. He indicated that he had always had a good relationship with his children and that "[t]his stuff has affected me and my family very, very bad." He continued, explaining that his son, who had served as a Marine for 4 years, was home the night the victim had called to tell her family what had just happened:

It was [a] very emotional experience. It affected my son Eddie very, very much. It's very hard to talk about it. It's something that I think about every day and

I've come to live with. In time I think that we will all go to counseling. We really want to get this behind us. We don't want this to dwell on us. We've got to go on. Things happen in life. We have just got to get on with it. My daughter has to get on with her life also. She finished college. She has a career ahead. I think that once this is over I think everybody will be able to get back to some sort of a normal situation.

Shortly thereafter, the following colloquy occurred between trial counsel and the victim's father:

Q. You briefly touched on the incident about how your family was notified of the incident. Would you explain to the court the circumstances of your daughter being raped?

A. We were sleeping. The phone rang about 1 or 2 o'clock in the morning. I picked it up and heard her crying and hysterical. She said, "Daddy, daddy." For a while I didn't know who it was. I had just talked to my daughter that evening. She had called us and said she arrived all right, everything was okay. I said, "Linda, is this you?" She says, "Please let me speak to mommy, let me speak to mommy." I kept repeating, "What's wrong, what's wrong," and she said, "Let me speak to mommy." I gave my wife the phone and my wife said, "You've been raped." What? It was like somebody hit me in the head. I thought I was in a dream. I didn't—I couldn't believe it. After the phone call we spoke to the nurse to find out how severely she was beaten. We were up all night. We both were in shock. We just started shaking. We couldn't get ·warm. We made reservations to leave at 7 o'clock in the morning and come down here the next morning.

After noting that he and his wife had traveled to Fort Sam Houston twice at their own expense to support their daughter, the father was asked to summarize how "this whole incident taken in totality has impacted on your family." He answered:

It's had a terrible impact. It's had a very, very bad impact. I try to conduct what I'm doing and it's difficult for me. I see my wife how she is. She is always very uptight. She was a very outgoing girl. It's on everybody's mind. It's like, you know, every time you meet somebody or you talk to somebody, "What happened, what happened." You don't want to go into it every time. I must have answered that question 30 or 40 times already to my friends and relatives. They know that all of a sudden we had to run down to Texas. They ask, "Well, why are you going down there, what's happening?" I can't even tell my mother, my sister. We've said that, "Well, she's been, you know, assault and battery," but the other things are very difficult to talk about. My son, of course, he knows. It has affected him. There is no question about my son. He is very affected by this. It is difficult to talk about and answer questions.

Subsequently, in his closing argument before sentencing deliberations, trial counsel made the following remarks pertinent to the impact of this crime on the prosecutrix and·her family:

When you consider today the potential rehabilitation of this accused, in determining and fashioning a fair sentence I want you to think about the accused as he sits here today. Does he look like an animal? No. Has he been acting like a criminal? No, he's behaved himself in the courtroom today. He's got a haircut. His uniform is squared away, but when you think about this accused in determining a sentence, think of how he must have looked to Linda Boeringer that night out in the field when he was brutally raping her and beating her. Think about how he must have appeared and behaved then when the constraints of law and civilization weren't upon him. Think about that poor young woman and her family; not poor Private Fontenot as he sits here today. Think of the terror and the agony that young woman had to go through that hellish night. Think of

that in determining just how long it's going to be before you're willing to take another chance on this individual, this rapist, imposing that agony on someone else.

\* \* \* \* \* \*

The Government would ask you to determine a fair sentence and think of the scars that young woman has. Think of the anger and disgust that her family was put through. Think of the scars on that woman.... There is not plastic surgery for that kind of scar. Every day for the rest of her life Linda Boeringer is going to have to suffer as a result of that incident. For the rest of her life she is going to have to suffer as a result of this rapist's actions. The truth is there are those individuals for whom rehabilitation is not a viable altnerative.

### B

■ Citing *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), appellant argues that "victim impact statements" create an unacceptable "risk that the jury's attention will be directed away from the blameworthiness of the defendant and toward the 'character of the victim and the effect on his family. These facts may be wholly unrelated to the blameworthiness of a particular defendant.'"

Appellant acknowledges that the *Booth* decision was in the arena of a capital-punishment case. Indeed, in footnotes 10 and 12 of that opinion, *supra* at 507, 509, 107 S.Ct. at 2335, 2536, the Court expressly limited its decision to capital cases—noting that in noncapital cases and, indeed, even in some capital cases, too, such statements may be relevant where they deal directly with the circumstances of the crime and where the judge has performed the Rule 403 analysis. He argues, nonetheless, that the same concerns that bothered the Court in *Booth* logically apply to noncapital cases as well.

We disagree. Until the Supreme Court itself indicates to the contrary, there simply is no reason to discount its clear indication in the footnotes discussed above that it sees a constitutional distinction between capital and noncapital cases in this area of the law, just as there is in other areas. *See generally Woodson v. North Carolina,* 428 U.S. 280, 303–04, 96 S.Ct. 2978, 2990–91, 49 L.Ed.2d 944 (1976) (plurality opinion of Justices Stewart, Powell, and Stevens).

Absent a constitutional basis for objection, the challenged testimony was admissible under the circumstances of this case. As the court below recognized, RCM 1001(b)(4) provides for admission of evidence "as to any aggravating circumstances directly relating to or resulting from the offense of which the accused has been found guilty." The Discussion following this provision in the Manual recognizes that this

> may include evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused and evidence of significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense.

As the Court of Military Review reasoned in interpreting this rule: "Just as the impact of a crime can extend beyond an individual to affect a command, it can extend to the victim's family. Indeed, the impact on the victim's family is yet another form of impact on the crime victim." 26 MJ at 563 (citation omitted).

Although not cited in the opinion below in this case for some reason, this Court already had reached this conclusion in *United States v. Pearson,* 17 MJ 149, 152–53 (CMA 1984), where we stated:

> [C]ourts-martial, like their civilian-judge counterparts, can only make intelligent decisions about sentences when they are aware of the full measure of the loss suffered by all the victims, including the family and the close community. This, in turn, cannot be fully assessed unless the court-martial knows what has been taken . . .

We now reiterate, however, the cautionary note that we sounded there:

> Of course, the very differences in our sentencing procedures [from those in Federal district courts] present unique challenges to military judges in maintaining the necessary environment of fairness and objectivity in the courtroom. Even relevant evidence must be excluded if its tendency to inflame the passions of the court exceeds its probative value. Mil.R.Evid. 403. Emotional displays by aggrieved family members, though understandable, can quickly exceed the limits of propriety and equate to the bloody shirt being waved.

17 MJ at 153.

### C

■ Here, the military judge expressly performed the balancing test of Mil.R.Evid. 403. Moreover, he admonished the witnesses not to resort to emotional pleas during their testimony and explained to them the appropriate limits of their testimony. Our reading of the record convinces us that the witnesses complied. Indeed, while touching, the testimony of the victim's parents was not inflammatory, and it was not much different in quality or content from what court members likely would assume would be the reaction of a rape victim's parents, even without such testimony.

Further, although trial counsel invited the members to consider the impact of the rape on the victim and her family in arriving at an appropriate sentence, his argument was responsible and fair and was not a plea to the members' passions. We point out, too, that defense counsel offered no objection to the prosecution's argument. *See* RCM 1001(g).

Accordingly, we conclude that the "victim impact statements" of the prosecutrix and her parents were fairly presented and argued as evidence to the members. Thus, they were properly admitted.

### III

The decision of the United States Army Court of Military Review is reversed as to sentence. The record of trial is returned to the Judge Advocate General of the Army for remand to that court, which may either reassess the sentence based on the admissible evidence or set aside the sentence and order a rehearing on sentence.[4]

Judges COX and SULLIVAN concur.

---

4. *See United States v. Suzuki,* 20 MJ 248 (CMA 1985).