**UNITED STATES, Appellee,**

v.

**Private First Class Edward L. WHITE-HEAD, 225–90–1208, United States Army, Appellant.**

**ACMR 8700178.**

U.S. Army Court of Military Review.

19 June 1990.

For Appellant: Captain Keith W. Sickendick, JAGC, Captain Jon W. Stentz, JAGC (on brief).

For Appellee: Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Martin D. Carpenter, JAGC (on brief).

Before MYERS, SMITH and PIERSON *, Appellate Military Judges.

## OPINION OF THE COURT

MYERS, Senior Judge:

Appellant was first tried by a general court-martial composed of officer and enlisted members in January, 1987, at Butzbach, Federal Republic of Germany. He was convicted of one specification each of premeditated murder and forcible sodomy in violation of Articles 118 and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 925 (1982) respectively [hereinafter UCMJ]. His sentence, approved by the convening authority, included a dishonorable discharge, confinement for life, total forfeitures, and reduction to Private El. On 2 May 1988, however, this court set aside the findings of guilty and the sentence and authorized a rehearing. *United States v. Whitehead*, 26 M.J. 613 (A.C.M.R. 1988).[1] A rehearing was held at Fort Leav-

---

* Judge Allen B. Pierson, Jr. took final action on this case prior to his release from active duty.

1. At an initial interview with U.S. Army Criminal Investigation Command (CID) agents, appellant gave an exculpatory statement. The agents were not convinced, however, and appellant agreed to take a polygraph examination. After indicating deception on the examination, appellant gave a second statement in which he admitted having had sex with the victim but denied killing her. CID agents were still skeptical, and appellant agreed to take a second polygraph examination. This test also indicated deception.

enworth, Kansas, on 16, 29, and 30 November and 1 December 1988 by a general court-martial composed of officer members. Appellant was again convicted of premeditated murder in violation of Article 118, UCMJ, but acquitted of forcible sodomy, and was again sentenced to a dishonorable discharge, confinement for life, total forfeitures, and reduction to Private El.[2] This sentence was also approved by the convening authority. In this appeal the appellant asserts that the evidence is insufficient to support the finding of premeditation, that the military judge erred by admitting gruesome photographs of the victim, and that the military judge erred by admitting victim impact evidence. We disagree and affirm.

Early on the morning of 1 July 1986 the body of Private [PVT] B was discovered face down in a ditch along a side road not far from the kaserne where she was assigned. Her throat had been cut from ear to ear and she had been stabbed eleven times in the back of the neck and two times in the middle of her back. The shorts she wore had been cut away, leaving her essentially nude below the waist. The evidence showed that PVT B had spent the evening of 30 June with one Specialist [SPC] C and some other friends. Later that evening PVT B suggested that they stop at the Welcome Inn, a popular disco bar near the front gate of the kaserne. SPC C did not want to go but took PVT B there where he dropped her off shortly before midnight. PVT B was a regular at the bar and most of the patrons knew her. Appellant, who also knew her, was already at the bar when PVT B arrived. After she had been there for perhaps an hour, appellant engaged PVT B in conversation, during which he asked her to have sex with him. In his first statement to CID agents (see footnote 1, *supra*), appellant stated that she re-

fused to have sex with him so he went home. After indicating deception on his first polygraph examination, however, appellant stated that she did agree to have sex and because she did not want to be seen leaving the disco with him, he drove and she walked to the location where her body was ultimately found. There, they had sex on the hood of appellant's car. Appellant further stated that when he last saw PVT B, she was alive and walking in the direction of the kaserne. Appellant's estranged wife, however, testified at the rehearing that appellant came home very late that night, appeared nervous, had blood "all over" his clothes, and had in his possession a "camouflage" knife from which she saw him cleaning blood (Prosecution Exhibit, or PE 7). Mr. G, a former cellmate of appellant's while in pretrial confinement, testified that "[appellant] told me that he killed someone by cutting them and then he had sex with ... the same person that he killed." A forensic pathologist called by the government testified that the nature of the throat wound would indicate that the wound was inflicted from behind, left to right, with "a fair amount of force," and that following such a wound the victim would be conscious for only a few seconds. After being shown pictures of a large blood spatter near the middle of the road, he further opined that the spatter pattern was consistent with her throat having been cut at that location and that she could thereafter have retained consciousness long enough to have staggered to the side of the road before collapsing, after which the stab wounds to the back were possibly inflicted. The cause of death, however, was the throat wound.

## I. SUFFICIENCY OF THE EVIDENCE

[1] This court is required by Article 66, UCMJ, 10 U.S.C. § 866, to determine both

---

At that point appellant stated, "Maybe I should get a lawyer." The polygraph examiner replied, "That's your decision. That's up to you." Then the examiner said something to the effect: "If you didn't do anything wrong, Ed, you don't need one, right?" Appellant paused, and the examiner said, "Well?" Appellant then looked up and said "I don't need one." The interview continued, resulting in appellant giving a third and incriminating statement. We reversed be-

cause: "[t]he [third] statement by the appellant was obtained in violation of constitutional standards for protection of that [right to counsel] privilege." *Whitehead,* 26 M.J. at 619.

**2.** The second polygraph examination and appellant's third statement were, of course, not alluded to in the rehearing.

the legal and factual sufficiency of the evidence.

The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt.

*United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987); *see also United States v. Hart,* 25 M.J. 143 (C.M.A.1987); *cert. denied,* 488 U.S. 830, 109 S.Ct. 85, 102 L.Ed.2d 61 (1988); *United States v. Harper,* 22 M.J. 157 (C.M.A.1986).

Here, appellant admitted to being with PVT B on the night in question at the place where her body was found. He returned home very late that night, about 0300, with blood "all over" his clothes and in possession of a knife with blood on it. Thereafter, while in pretrial confinement, he confided to his cellmate that he had "killed someone."

With regard to the issue of premeditation:

Both specific intent to kill and premeditation can be proven by circumstantial evidence.... The existence of these elements can be established based on inferences drawn on the circumstances surrounding the killing, including the viciousness or cruelty of the assault....

*United States v. Ayala,* 22 M.J. 777, 797 (A.C.M.R.1986); *aff'd* 26 M.J. 190 (C.M.A. 1988) (citations omitted). Here, the sheer savagery of the assault upon PVT B, the fatal neck wound inflicted upon her from behind, followed by the thirteen stab wounds, leave no reasonable doubt that appellant entertained the premeditated intent to kill. We hold, therefore, that the evidence of record, considered in its entirety with all reasonable inferences to be drawn therefrom, is sufficient to enable a reasonable factfinder to find all essential elements of the offense of premeditated murder beyond a reasonable doubt. We are likewise convinced of appellant's guilt beyond a reasonable doubt. Accordingly, appellant's first assignment of error is without merit.

## II. GRUESOME PHOTOGRAPHS

[2] Appellant next contends that the military judge erred by admitting "gruesome photos of the victim's gaping neck wound." Specifically, he complains of PE's 22 and 26, 27, and 28. PE 22, among others, was utilized by one of the CID agents investigating the case to identify the victim, to describe the crime scene, the position and condition of the body, the condition of her clothing, the locations of wounds, and to explain other actions taken by the agent. PE's 26, 27, and 28, among others, were utilized by a forensic pathologist to describe the wounds in medical terms, the effects of the wounds, and which one was fatal and why. He also used these photographs to explain how he arrived at his expert opinion on how the offense was committed. Thus, all photographs of the victim were utilized by various witnesses to describe and illustrate various aspects of the crime.

In one of the early and still leading cases on this issue, the Court of Military Appeals stated:

It is well established that a photograph may be admitted in evidence for the purpose of identifying a person, even though it possesses a shocking aspect which might conceivably tend to excite the passion of the jury ... The accused was charged with the commission of a particularly brutal attack upon [the female victim]. In so far as the photograph was characterized by a shocking aspect not possessed by the subject herself under other circumstances, any danger of prejudice arising from this quality was overborne by the contribution made by it to the court's comprehension of the nature of the accused's misconduct. The photographs of the deceased soldier were admissible to prove the exact nature of his

wounds and the manner of death.... Here there were several wounds which were discussed at length by various prosecution witnesses, including a medical expert. The photographs served to provide assistance in explaining and illustrating this testimony and enabling the court-martial to determine the cause of death. *United States v. Bartholomew*, 3 C.M.R. 41, 48 (C.M.A.1952) (citations omitted). The court revisited the issue in *United States v. Harris*, 21 C.M.R. 58, 66 (C.M.A. 1956) wherein Judge Latimer, citing *Bartholomew*, commented:

> [T]he record reveals that these [photographs showing the wounds on the victim's body] were referred to extensively by the medical officer, who examined the body shortly after the homicide, when he testified as to the cause of death.... Whether they were or were not inflammatory is not the matter of importance. They served a legitimate purpose and that renders them admissible.

*See also United States v. White*, 23 M.J. 84, 88 (C.M.A.1986) (photographs of victim were introduced for a legitimate purpose and aided the factfinding process by making the medical testimony easier to understand); *United States v. Mobley*, 28 M.J. 1024, 1029 (A.F.C.M.R.1989) (trial judge has broad discretion in admitting photographic evidence which is offered for a legitimate purpose and the probative value of which outweighs the risk of unfair prejudice to the accused).

We find that the photographs in question were offered, admitted, and utilized for legitimate purposes and that their probative value outweighed the risk of unfair prejudice to appellant. We hold, therefore, that this assigned error is also without merit.

### III. VICTIM IMPACT EVIDENCE

[3, 4] In his final assignment of error, appellant asserts that the military judge erred by "failing to maintain a fair and neutral environment for impartial sentenc-

ing, resulting in an inappropriately severe sentence." Specifically, appellant complains that the military judge should not have allowed PVT B's mother and father, the latter of whom is a Presbyterian minister, to testify as to the effect of PVT B's death on the family. Appellant argues that in *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the United States Supreme Court rejected the relevance of victim impact evidence in the capital sentencing process and, although the Court left undecided the question whether such evidence is relevant in noncapital cases, the same rationale should apply in noncapital as in capital cases. Thus, appellant asks us to apply the *Booth* rule to his case. We decline his invitation to do so.

The trial counsel advised the military judge that she had three family members waiting to testify on sentencing as to the effect of PVT B's death on the family. The following colloquy then occurred:

> MJ: ... You can go too far in that kind of thing. Just remember, you know, you've got a charge from me to [the court members], that the minimum sentence is life. Don't go too far.
>
> TC: Yes, sir.
>
> MJ: Don't get into emotions.
>
> TC: Sir, I don't think I can put the parents on the stand without some emotion.
>
> MJ: Then what is it for?
>
> TC: To tell the jury the effect that this has had on their lives, sir. They are the victims in this case, or at least the only remaining victims.
>
> MJ: Just be careful, you can run too close to the line.
>
> TC: Yes, Sir.

(R. 398). PVT B's mother testified first, after which the military judge expressed his continuing concern:

> MJ: Do you think you need to call all three?
>
> DDC: Sir, that was my thought, sir, or concern.[3]

---

**3.** This is the closest the defense came to objecting to this evidence at the trial. We hold that this was insufficient to constitute a valid objection. *United States v. Taylor*, 21 M.J. 840, 843 n.

5 (A.C.M.R.1986) (objections must be timely and stated with particularity, otherwise waiver results); *United States v. Wade*, 1 M.J. 600 (A.C.M.R.1975) (specific grounds must be stated for

TC: Sir, they have requested the opportunity.

MJ: That, I understand and everything, but the fact that they have requested the opportunity doesn't necessarily mean that they should be sitting there and it depends on what they are going to say, and you just kind of let them go. I would suggest that we cut it off at this point, after Mr. [B].

TC: All right, sir.

(R. 408).

It is clear from the foregoing that the military judge was acutely aware of this issue and specifically determined that the relevance of the testimony of PVT B's parents met the Manual for Courts–Martial, United States, 1984, Military Rule of Evidence [hereinafter Mil.R.Evid.] 403[4] balancing test. The Court of Military Appeals rejected arguments similar to appellant's in *United States v. Fontenot*, 29 M.J. 244, 252 (C.M.A.1989) wherein the court held admissible the testimony of a rape victim and her parents.

> Indeed, while touching, the testimony of the victim's parents was not inflammatory, and it was not much different in quality or content from what court members likely would assume would be the reaction of a rape victim's parents, even without such testimony. Further, although trial counsel invited the members to consider the impact of the rape on the victim and her family in arriving at an appropriate sentence, his argument was responsible and fair and was not a plea to the members' passions. We point out, too, that defense counsel offered no objection to the prosecution's argument. *See* RCM 1001(g).

> Accordingly, we conclude that the "victim impact statements" of the prosecutrix and her parents were fairly presented and argued as evidence to the mem-

bers. Thus, they were properly admitted.

*Id.* at 252.

The quoted language quite accurately describes the circumstances of the case *sub judice*. The testimony of Reverend and Mrs. B, who were in fact the adoptive parents of PVT B, was eloquent, articulate, and touching, yet not bitter, recriminatory, or inflammatory. Their testimony could reasonably be expected from virtually any parent who lost a child through a tragic and untimely death. Trial counsel's comments on their testimony were reasonable and appropriate and were not objected to by the defense. As Senior Judge Adamkewicz stated when the *Fontenot* case was before this court:

> Just as the impact of a crime can extend beyond an individual to affect a command, ... it can extend to a victim's family. Indeed, the impact on the victim's family is yet another form of impact on the crime victim.

*United States v. Fontenot*, 26 M.J. 559, 563 (A.C.M.R.1988), *rev'd on other grounds*, 29 M.J. 244 (C.M.A.1989).

We hold, therefore, that the testimony of Reverend and Mrs. B was properly admitted as evidence in aggravation.

## IV. SPOUSAL COMMUNICATIONS

Pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982) appellant personally alleges, *inter alia*, that "the military judge improperly denied the defense motion to suppress the testimony of appellant's wife, and particularly her testimony regarding his oral statements [to her]." We disagree.

During defense cross-examination of Robin Whitehead, appellant's estranged wife, the following exchange took place:

---

objections to admissibility of evidence; failure to object constitutes waiver); Mil.R.Evid. 103(a)(1).

**4.** Mil.R.Evid. 403 provides:
   Although relevant, evidence may be excluded if its probative value is substantially out-

weighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Q. You told [CID agents] that you didn't see anything unusual that night, didn't you?

A. I don't remember telling them that.

Q. You don't remember what you said to them. Do you remember talking to them?

A. Yeah. The only thing I remember was telling them what time—

Q. —Well, what time did you tell them?

A. —that he told me to tell them what time he came home.

(R. 180–81). Individual defense counsel objected to this answer as disclosing a confidential communication and asked the military judge to strike it and instruct the court to disregard it. The military judge denied the request, reasoning that "if [appellant] told her to tell somebody else something it wasn't a confidential communication."

■■■ The "husband-wife privilege" is embodied in military law in Mil.R.Evid. 504, which categorizes the rule into two parts. Section (a) pertains to spousal capacity to testify and provides simply: "A person has a privilege to refuse to testify against his or her spouse." In commenting on this rather terse language, the Court of Military Appeals, per Chief Judge Everett, stated:

[Rule 504(a)] quite clearly makes two points ...: First, the privilege belongs to the witness-spouse; second, the privilege addresses the capacity of the testifying spouse to testify in court at all, rather than the content of that testimony.

*United States v. Hughes*, 28 M.J. 391, 393 (C.M.A.1989). Here, the option to testify or not rested solely with Mrs. Whitehead, the witness-spouse. Further, her testimony regarding the time appellant returned home, his appearance at that time, and the bloody knife were based on acts of the appellant and not on marital communications between the two of them. *United States v. Martel*, 19 M.J. 917, 927 (A.C.M. R.1985) (acts of one spouse generally do not constitute confidential communications with the other). Accordingly, the military judge properly admitted Mrs. Whitehead's testimony in those matters.

The second part of the "husband-wife privilege" is the rule regarding confidential communications between spouses. Mil.R. Evid. 504(b) essentially retains the common law rule in this regard, providing in pertinent part:

(1) *General rule of privilege.* A person has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, any confidential communications made to the spouse of the person while they were husband and wife and not separated as provided by law.

(2) *Definition.* A communication is "confidential" if made privately by any person to the spouse of the person and *is not intended to be disclosed to third persons* other than those reasonably necessary for transmission of the communication.

(emphasis added).

It has long been held that "[m]arital communications are presumptively confidential," *Blau v. United States*, 340 U.S. 332, 333, 71 S.Ct. 301, 302, 95 L.Ed. 306 (1951); *Hipes v. United States*, 603 F.2d 786 (9th Cir.1979); and such presumption may only be overcome "by proof of facts showing that they were not intended to be private." *Pereira v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1954). Thus, in *Wolfle v. United States*, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934), the Court held that the privilege did not apply where the defendant's stenographer testified as to disclosures dictated to her by the defendant in a letter to defendant's wife. Similarly, it was held in *United States v. Thompson*, 716 F.2d 248, 250 (4th Cir.1983), that:

Proof of either the presence of a third party at the time of the communication, *or of the intention that the information conveyed be transmitted to a third person*, will negate the presumption of privacy.

(emphasis added). *See also United States v. Martel*, 19 M.J. at 917.

■■■ We agree with the military judge that appellant's communication to Mrs. Whitehead to "tell them what time he came home" was not a confidential communica-

tion since it was intended to be conveyed by her to third persons, namely CID agents that might come calling. Even assuming *arguendo* that such communication was privileged, Mrs. Whitehead's disclosure thereof was harmless because the time he told her to tell them was not disclosed and because, even without such disclosure, the evidence of appellant's guilt was sufficient beyond a reasonable doubt.

We have carefully considered appellant's other *Grostefon* assertions of error and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Judge SMITH and Judge PIERSON concur.