*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

### UNITED STATES
Appellee

**v.**

### Isaiah L. EDWARDS, Airman First Class
United States Air Force, Appellant

**No. 21-0245**
Crim. App. No. 39696

Argued November 17, 2021—Decided April 14, 2022

Military Judge: Jefferson B. Brown

For Appellant: *Captain David L. Bosner* (argued); *Mark C. Bruegger,* Esq. (on brief).

For Appellee: *Major Jessica L. Delaney* (argued); *Colonel Naomi P. Dennis, Lieutenant Colonel Matthew J. Neil*, and *Mary Ellen Payne,* Esq. (on brief); *Major Alex B. Coberly*.

Judge HARDY delivered the opinion of the Court, in which Judge MAGGS and Senior Judge COX joined. Chief Judge OHLSON filed a separate opinion concurring in part and dissenting in part, in which Judge SPARKS joined.

————————

Judge HARDY delivered the opinion of the Court.

During the presentencing phase of Appellant's court-martial proceedings, after he was convicted of murder, trial counsel proffered an unsworn victim statement from the victim's father that included two videos as attachments. The first of the videos, the one at issue in this case, was produced by the trial counsel and included an interview with the victim's parents and a slideshow of photographs set to acoustic background music. Over defense counsel's objection, the military judge allowed the panel to watch the video and also to take a copy of it into their sentencing deliberation. We granted review to decide whether the military judge abused his discretion by allowing the video as an unsworn victim statement under Rule for Courts-Martial (R.C.M.) 1001A(e) (2016 ed.),

which authorizes a victim or the victim's designee to make an unsworn statement that may be "oral, written, or both."[1]

We conclude that the military judge abused his discretion for two reasons. First, R.C.M. 1001A(e) requires unsworn statements to be either "oral, written, or both." As the Government conceded at oral argument, a video including acoustic music and pictures is neither oral nor written and thus violates the rule. Second, because trial counsel produced the video on behalf of the victim's family, the video was, at least in part, trial counsel's statement rather than theirs. The right to make an unsworn statement solely belongs to the victim or the victim's designee and cannot be transferred to trial counsel. *United States v. Hamilton*, 78 M.J. 335, 342 (C.A.A.F. 2019); *United States v. Barker*, 77 M.J. 377, 378 (C.A.A.F. 2018).

Because we believe that the video was materially important to the Government's sentencing case, we conclude that the Government has not met its burden to prove that the erroneously admitted video did not have a substantial influence on Appellant's sentence. For these reasons, the opinion of the United States Air Force Court of Criminal Appeals (AFCCA) is affirmed with respect to the findings but reversed with respect to the sentence. Appellant's sentence is vacated, and we return the record to the Judge Advocate General of the Air Force for remand to the AFCCA to either reassess the sentence based on the affirmed findings or order a sentence rehearing.

## I. Background

On March 27, 2018, Appellant killed his roommate, Airman Bradley Hale, in a particularly senseless and unprovoked act of violence. *See United States v. Edwards*, No. ACM 39696, 2021 CCA LEXIS 106, at \*4, 2021 WL 923079, at \*2–3 (A.F. Ct. Crim. App. Mar. 10, 2021) (describing the murder). A general court-martial convicted Appellant, contrary to his

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), the Military Rules of Evidence, and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (*MCM*) (2016 ed.) unless otherwise specified.

plea, of one charge and specification of unpremeditated murder in violation of Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918 (2012 & Supp. IV 2013–2017).

After Appellant's conviction, the military judge held an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2018) session to decide what information would be considered in the presentencing phase. Pursuant to Article 6b(c), UCMJ, 10 U.S.C. § 806b, the military judge appointed Airman Hale's father as designee for the purpose of effectuating the deceased victim's right to be reasonably heard. Trial counsel proffered a one-page, printed, unsworn statement from the victim's father. The father's statement also included two videos as attachments, only one of which is at issue in this appeal. That video included an interview of the victim's parents discussing the victim and a slideshow of pictures of the victim set to acoustic background music.

Defense counsel objected to the video, stating, "We do not object to [the] statements themselves of [the victim's parents] but the photos with music, we do not believe that is proper victim impact." Defense counsel argued that the video failed to comply with R.C.M. 1001A because "a video in general is not a statement" and, more specifically, because the challenged video included photos as well as background music. In response, the Government argued that showing the video was within the victim's right to be reasonably heard under Article 6b, UCMJ.

During the hearing, the military judge questioned who produced the video, initially stating his understanding that Airman Hale's father or family created the video themselves. Trial counsel explained that the Government assisted in the production of the video but that the video was based on the materials provided by the victim's family, and that the video represented "what they wanted." Defense counsel asked for further clarification, stating his understanding that although the family provided input into the video, "it was put together by trial counsel." Trial counsel confirmed that was correct.

The military judge then held that the video was a proper unsworn victim statement under R.C.M. 1001A. Regarding the pictures and music in the video, the military judge held:

> As to the music, it did not have any words, it was acoustical, the court certainly recognizes that certain music can be designed or intended to evoke certain emotions of sadness or sorrow or despair. The music in this case although obviously not upbeat, the court did not find that it invokes such emotion or sadness or rage. The impact was provided, in other words, [by] the family, not the music choice. Though certainly there has been no evidence here I would not expect the music itself was [in] anyway [sic] created by the victim I believe it was a neutral backdrop. There are pictures and discussions, not about the victim and how his loss or how his death impacted the family. It was not intended and will not and would not inflame the passions of the members.

During the Government's presentencing case, both the victim's mother and father provided sworn victim statements as to Airman Hale's character and how his death affected their family. After Airman Hale's father gave his sworn statement, the Government rested. Airman Hale's father then read his unsworn statement, after which trial counsel played the challenged video.

The video was seven minutes long and included a slideshow of thirty photos, most of which depicted either the victim by himself or with his family. The slideshow also included one photo of the victim's gravestone. Only one of the thirty photos was previously admitted into evidence. In addition to the photos, the video also included two clips of the victim's parents answering questions about their son as well as a clip that panned across the family's fireplace, which was covered with family photos and mementos. Acoustic background music played throughout the video. After the video, defense counsel called two witnesses on behalf of the defense, then the military judge called a recess and the court-martial moved into the sentencing phase.

The sentencing phase began with an Article 39(a), UCMJ, session during which trial counsel requested permission to play part of the unsworn statement video while making her sentencing argument. Specifically, trial counsel requested to play a forty-five-second clip of the victim's father holding and smelling the victim's Air Force uniform. Trial counsel argued that playing the video would demonstrate the full impact of

the crime and that the video would not go into the deliberation room with the panel. Defense counsel objected on the grounds that the video was part of an unsworn statement and was not admitted into evidence. The military judge overruled the objection on the basis that the video had already been seen as part of the unsworn victim statement and could properly be considered by the panel.

The court-martial proceeded to the argument phase of sentencing. Trial counsel described the crime in detail and explained the effect Appellant's actions had on the victim, his family, and their community. Trial counsel concluded her argument by playing the video clip of the victim's father crying into the victim's uniform, and making the following statement:

> Members, as you watch that clip you saw him take this uniform. His son's uniform. He brings it up his nose and breathes it in. Members that is a man who is clinging to the last vestiges of his son. He will never come back. Members, because of this man right here, Airman Bradley Hale's life is over forever. He is not coming back. The lives of those around him have been altered and it is completely appropriate, necessary, and fair that his punishment be fitting for his crime. He chose to murder Airman Bradley Hale. And for that the appropriate sentence is reduction to the grade of E-1, dishonorable discharge, confinement where he will not get out, no eligibility for parole.

After the conclusion of the sentencing arguments, the military judge, contrary to the earlier statement by trial counsel, included the video in the materials provided to the panel for consideration during their closed-door sentencing deliberation.

The panel sentenced Appellant to thirty-five years of confinement, reduction to E-1, forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority approved the adjudged sentence.

On appeal to the AFCCA, Appellant argued that the military judge abused his discretion when he allowed the video to be shown because neither the video nor its contents complied with the requirements of R.C.M. 1001A(e). The AFCCA disagreed, holding that: (1) video is a proper method to provide an

unsworn statement; and (2) the pictures and music were proper because they "could reasonably convey the loss suffered by [the victim], his family, and his community." *Edwards*, 2021 CCA LEXIS 106, at *68, 2021 WL 923079, at *24. The AFCCA also held that although the background music and pictures were "unusual," including them was not "obviously unreasonable" given the victim's right to be reasonably heard under Article 6b(a)(4)(B), UCMJ. *Id.* at *69, 2021 WL 923079, at *24.

We granted review to decide:

> Whether the military judge abused his discretion by allowing the victim to present as an impact statement a video—produced by the trial counsel—that included photos and background music.

*United States v. Edwards*, 81 M.J. 424 (C.A.A.F. 2021) (order granting review).

## II. Discussion

Appellant challenges the validity of the video on three primary grounds. First, Appellant argues broadly that a prerecorded video can never be a permissible means of presenting an unsworn statement under R.C.M. 1001A. Second, even assuming that an unsworn statement can be presented in such a manner, Appellant argues that the content of the video—which included a slideshow and background music—violated R.C.M. 1001A(e) which states that unsworn statements may be "oral, written, or both." Finally, Appellant argues that because trial counsel produced the video presented in this case, trial counsel impermissibly usurped the victim designee's right to be heard and make an unsworn statement. We address each argument in turn.

## A. Standard of Review

A military judge's interpretation of R.C.M. 1001A is a question of law this Court reviews de novo. *Barker*, 77 M.J. at 382. The Court reviews "a military judge's decision to admit evidence for an abuse of discretion." *Hamilton*, 78 M.J. at 340 (quoting *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). After *Hamilton*, the Court held that unsworn victim statements are not evidence. *United States v. Tyler*, 81 M.J. 108, 112 (C.A.A.F. 2021). Nevertheless, both Appellant and

the Government assert that the Court should still apply the abuse of discretion standard because, as the Government states, the military judge still acts as a " 'gatekeeper' to ensure that the content of a victim's unsworn statement comports with the parameters established by R.C.M. 1001A." Brief for Appellee at 11, *United States v. Edwards*, No. 21–0245 (C.A.A.F. Sep. 13. 2021) [hereinafter Gov't Br.] (quoting *Tyler*, 81 M.J. at 113). We agree. Abuse of discretion is the proper standard of review for determining whether a military judge erroneously admitted an unsworn victim statement under R.C.M. 1001A. A military judge abuses his discretion when his legal findings are erroneous, *Barker*, 77 M.J. at 383, or when he makes a clearly erroneous finding of fact, *United States v. Eugene*, 78 M.J. 132, 134 (C.A.A.F. 2018).

### B. Prerecorded Videos as Unsworn Statements

Appellant first asserts generally that R.C.M. 1001A prohibits an unsworn victim statement from being presented via prerecorded video. We need not—and do not—decide whether the rules would ever permit a victim to offer an unsworn statement via prerecorded video because the video at issue in this case was plainly deficient for the two reasons explained below.

### C. Presentation of Non-Oral or Non-Written Statements

Turning to the specific video challenged in this case, Appellant argues that the military judge abused his discretion by allowing the video as an unsworn statement under R.C.M. 1001A(e) because it included, in addition to recorded statements by the victim's parents, a picture slideshow and background music. We agree. Under the plain text of R.C.M. 1001A(e), unsworn statements may be "oral, written, or both." As the Government conceded at oral argument, neither pictures nor music qualify as oral statements or as written statements under the rule:

> Q: Are pictures an oral statement?
>
> A: Under the plain language of the word oral, they are not.
>
> Q: Are pictures a written statement?
>
> A: Under the definition in R.C.M. 103, they are not.

Q: Okay, and is music an oral statement?

A: Not under a plain definition or the MCM defini-
tion, no your Honor.

Q: Is music a written statement?

A: No your Honor.

Oral Argument at 17:50–18:16, *United States v. Edwards*, No.
21-0245 (C.A.A.F. Nov. 17, 2021).

The Government's concession was undoubtedly correct.
Applying the standard rules of statutory construction—as we
must[2]—we agree that the plain meaning of "oral" or "written"
statements would exclude the photographic and musical ele-
ments of the video presented in this case. "Oral" is defined as
"[s]poken or uttered; not expressed in writing." *Black's Law
Dictionary* 1320 (11th ed. 2019). And the rules define "[w]rit-
ing" as "printing and typewriting and reproductions of visual
symbols by handwriting, typewriting, printing, photostating,
photographing, magnetic impulse, mechanical or electronic
recording, or other form of data compilation." R.C.M. 103(20);
*see also Merriam-Webster Dictionary*, https://www.merriam-
webster.com/dictionary/written (last visited April 11, 2022)
(defining "written" as "made or done in writing"). Neither pho-
tographs nor music fit under either definition.

The court below elected to disregard the plain text of
R.C.M. 1001A(e) and instead held that the video was permis-
sible because it was not "obviously unreasonable" and because
this Court's predecessor previously held that courts-martial
"can only make intelligent decisions about sentences when
they are aware of the full measure of loss suffered by all of the
victims, including the family and the close community." *Ed-
wards*, 2021 CCA LEXIS 106, at *68–69, 2021 WL 923079, at
*24 (internal quotation marks omitted) (quoting *United
States v. Pearson*, 17 M.J. 149, 153 (C.M.A. 1984)). The
AFCCA's reliance on this principle was misplaced and cannot
overcome the plain text of R.C.M. 1001A(e), which prohibits
the inclusion of elements in an unsworn statement that are
neither oral nor written. Accordingly, the military judge

---

[2] "Ordinary rules of statutory construction apply in interpreting
the R.C.M." *United States v. Hunter*, 65 M.J. 399, 401 (C.A.A.F.
2008) (citation omitted).

abused his discretion by erroneously allowing the video as part of an unsworn victim statement.

### D. Incorporation of Trial Counsel's Statements

Appellant also argues that the video presented in this case violated R.C.M. 1001A because trial counsel produced the video, and thus it presented not only the victim's unsworn statement, but also the trial counsel's statement. In response, the Government argues that the Court need not answer the question because Appellant waived the issue at trial. We deal first with question of waiver.

"[W]aiver is the intentional relinquishment or abandonment of a known right." *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (internal quotation marks omitted) (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). "Whether an accused has waived an issue is a question of law we review de novo." *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017). At trial, Appellant objected to the video and moved for its exclusion as improper sentencing material under R.C.M. 1001A. In the ensuing Article 39(a), UCMJ, session, the military judge and counsel for both parties engaged in an extended discussion about the video, its contents, and who contributed to its production.

During this discussion, the military judge questioned trial counsel regarding how the video was produced and whether the video contained statements beyond those of the victim's family. Initially, the military judge stated his understanding that the video was something that the victim's father or the victim's family created themselves, rather than something that was produced for them, and asked trial counsel if that was correct. Trial counsel explained that the Government "provided assistance for and help[ed] compile" the video based on the materials provided by the victim's family and stated, "it is their statement, [it] is what they wanted."

When the military judge asked defense counsel if he had anything further to say about the video, defense counsel asked for clarification about the Government's role in the production of the video. Defense counsel stated that he was "not in any way implying that any impropriety was done," but his understanding was "that the family provided the photographs

and trial counsel actually put the video together." Trial counsel then confirmed that defense counsel's understanding was correct, and that trial counsel put the video together after consulting with the family multiple times. Finally, after being asked again by the military judge whether there was any dispute between the parties about how the video was produced, defense counsel replied, "[t]hat is not a point we are contesting. . . . I think we are in agreement that the family provided input and that it was put together by trial counsel."

The Government argues that defense counsel's remarks—specifically his statement that he was "not in any way implying that any impropriety was done" and that "[this] is not a point we are contesting"—affirmatively waived any objection about whether the video improperly incorporated any statements beyond those of the victim's family. We disagree. In context, defense counsel's remarks were nothing more than confirmation that—despite some initial confusion about trial counsel's role in the production of the video—both sides agreed that trial counsel produced the video with input from the family. Although defense counsel's statements indicated that there was no longer any dispute over the *factual* question of how the video was produced, we do not interpret his statements as waiving the *legal* question raised by the military judge about whether the video improperly included statements beyond those of the victim's family.[3]

Because the legal question was not waived, we address it on the merits. Congress has granted the victim of an offense under the UCMJ the right to be "reasonably heard" during any sentencing hearing related to that offense. Article 6b(a)(4)(B), UCMJ. The statute provides for the appointment of an individual to stand in for the victim if the victim, like

---

[3] The Government argues in its brief that even if Appellant did not affirmatively waive this objection, he still forfeited it because he did not specifically raise it at trial. Gov't Br. at 13, 24, 27. Even if this issue was forfeited, we would review for plain error, *United States v. Sweeney*, 70 M.J. 296, 303–05 (C.A.A.F. 2011), and we think that the error was clear and obvious based on this Court's holdings that the right to make an unsworn victim statement belongs solely to the victim or to the victim's designee, *Barker*, 77 M.J. at 378; *Hamilton*, 78 M.J. at 342.

Airman Hale in this case, is deceased. Article 6b(c), UCMJ. The President implemented the victim's statutory right to be reasonably heard via R.C.M. 1001A, which authorizes the victim (or the victim's designee when appropriate) to "make a sworn or unsworn statement." R.C.M. 1001A(b)(4)(B), (e). The rule further provides that "[u]nsworn statements may be oral, written, or both." R.C.M. 1001A(e).

In two prior cases, this Court established that the right to make an unsworn victim statement belongs solely to the victim or to the victim's designee and not to trial counsel. *Barker*, 77 M.J. at 378; *Hamilton*, 78 M.J. at 342. The right "is separate and distinct from the *government's* right to offer victim impact statements in *aggravation*, under R.C.M. 1001(b)(4)." *Barker*, 77 M.J. at 378. In *Hamilton,* the Court cautioned that the unsworn statement "is not a mechanism whereby the government may slip in evidence in aggravation that would otherwise be prohibited by the Military Rules of Evidence, or information that does not relate to the impact from the offense of which the accused is convicted." 78 M.J. at 342 (citing R.C.M. 1001(b)(4)).

Here, because Airman Hale was killed by Appellant, Hale's father was appointed as the victim's designee. As such, he was permitted to proffer an unsworn victim statement under R.C.M. 1001A, and he did so without objection. But after the conclusion of Hale's father's statement, the challenged video was played in open court as an "additional presentation." As discussed above, the video contained artistic elements beyond just the victim impact statements of Airman Hale's parents, including a thirty-image slideshow and background music. These artistic elements were incorporated into the video for the purpose of delivering a non-written and non-oral message to the panel, but to whom should we attribute that message?

We believe the answer to that question must be to Government trial counsel. In producing the video, trial counsel made creative and organizational decisions that lead us to believe that the video incorporated her own personal artistic expression. Even if the President had not limited unsworn victim statements to be solely oral or written (and thus excluded statements in the form of artistic expression), this Court has been clear that unsworn victim statements belong solely to

11

the victim or the victim's designee. *Barker*, 77 M.J. at 378; *Hamilton*, 78 M.J. at 342. Unsworn victim statements are not a vehicle by which the government can supplement its sentencing arguments by putting its own statements—oral, written, artistic, or otherwise—into the victim's mouth. Of course, victims may confer with trial counsel in preparation for their unsworn statements, *see* Article 6b(a)(5), UCMJ, but trial counsel may not misappropriate the victim's right to be heard, as trial counsel did here when she created the video on the victim's family's behalf.

### E. Prejudice

When the Court finds error in the admission of sentencing evidence (or sentencing matters), the test for prejudice is "whether the error substantially influenced the adjudged sentence." *Barker*, 77 M.J. at 384 (internal quotation marks omitted) (quoting *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009) (per curiam)).[4] As the Government concedes in its brief, it bears the burden of demonstrating that the admission of erroneous evidence was harmless. Gov't Br. at 34 (citing *United States v. Flesher*, 73 M.J. 303, 318 (C.A.A.F. 2014)).

Appellant urges the Court to adopt a "harmless beyond a reasonable doubt" standard for analyzing prejudice in cases where the error regarding an unsworn victim statement implicates an appellant's constitutional rights, and asserts that in the present case, the presentencing error has "constitutional dimensions—specifically, [regarding] due process and the right to a fair trial." Brief for Appellant at 35–36, *United States v. Edwards*, No. 21-0245 (C.A.A.F. Aug. 13. 2021) [hereinafter App. Br.]. In support of this argument, Appellant cites to two cases where the Court decided issues related to unlawful command influence (UCI). In each case the Court

---

[4] As stated above, the Court has held that unsworn victim impact statements are not evidence, but presentencing "matters" that may be presented to and considered by the panel. *Tyler*, 81 M.J. at 112–13. Although the Court's earlier precedents use the word "evidence" when discussing prejudice caused by erroneous unsworn victim impact statements, *Tyler*'s clarification did not alter our test for prejudice because, either way, the test is based on application of Article 59, UCMJ, 10 U.S.C. § 859. *Sanders*, 67 M.J. at 345–46.

applied a harmless beyond a reasonable doubt standard because prior precedent held that UCI issues raise constitutional due process concerns. *United States v. Jerkins*, 77 M.J. 225, 228–29 (C.A.A.F. 2018) ("Application of the harmless beyond a reasonable doubt standard is consistent with this Court's position that unlawfully influencing a court-martial raises constitutional due process concerns . . . ."); *United States v. Pope*, 63 M.J. 68, 75–76 (C.A.A.F. 2006) (applying the harmless beyond a reasonable doubt standard when the military judge admitted a letter from appellant's commanding officer suggesting harsh punishment would be appropriate).

We decline Appellant's request to adopt a harmless beyond a reasonable doubt standard generally or to apply it specifically in this case. As both Appellant and the Government note in their briefs, the Court has already established a four-factor test to evaluate prejudice when there is a nonconstitutional presentencing error. App. Br. at 15 (citing *Hamilton*, 78 M.J. at 343); Gov't Br. at 35 (same). Although Appellant argues that this case has "constitutional dimensions—specifically due process and the right to a fair trial," he does not explain exactly how either right was infringed. App. Br. at 36. In our view, the errors identified in this case arise not out of the video's failure to comply with the Constitution, but rather from failure to comply with the rules promulgated by the President and with Article 6b, UCMJ. Also, this is not a UCI case, so Appellant's reliance on *Jerkins*, 77 M.J. 225, and *Pope*, 63 M.J. 68, is unpersuasive. Accordingly, our task in the present case is to decide whether the Government established that the military judge's error in admitting the challenged video did not substantially influence Appellant's adjudged sentence. *Barker*, 77 M.J. at 384; *Sanders*, 67 M.J. at 344.

The Court considers four factors when deciding whether an error substantially influenced an appellant's sentence: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Barker,* 77 M.J. at 384 (internal quotation marks omitted) (quoting *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017)). We consider these factors de novo. *United States v. Thompson*, 63 M.J. 228, 231 (C.A.A.F. 2006). The Court has also reasoned that an error is more likely to have prejudiced an appellant if

the information conveyed as a result of the error was not already obvious from what was presented at trial. *United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F. 2007).

Before analyzing the individual factors, it is worth noting that this test—which the Court has applied to errors that occur during both the findings and sentencing phases of the court-martial—is considerably more difficult to apply to sentencing. Although there is a binary decision to be made with respect to the findings (guilty or not guilty), there is a broad spectrum of lawful punishments that a panel might adjudge. Complicating matters further, it is much more difficult to compare the "strengths" of the competing sentencing arguments than it is to weigh evidence of guilt. Proof of guilt can be overwhelming even without the erroneously admitted evidence, but there is no analogous analysis for determining the appropriate sentence. It is thus harder for the Government to meet its burden of showing that a sentencing error did not have a substantial influence on a sentence than it is to show that an error did not have a substantial influence on the findings.

Proceeding to the first factor, with respect to the strength of the Government's case, we agree with the court below that there was "exceptionally strong aggravation evidence considering the unprovoked violence that preceded the killing as well as the impact of Appellant's crime on [Airman Hale's] family and friends." *Edwards*, 2021 CCA LEXIS 106, at *70, 2021 WL 923079, at *24. The Government rightfully notes that Appellant committed a "senseless and unprovoked murder of a fellow airman, in the dorms, at a deployed location," and that Appellant "misled and slowed down" the first responders who came to help Airman Hale. Gov't Br. at 35. And although we find error in the admission of the video attached to Airman Hale's father's unsworn statement, that error in no way diminishes the impact of the permissible and appropriate sentencing testimony of Airman Hale's family and friends.

With respect to the second factor, we also agree with the court below that Appellant's sentencing case was weak relative to the Government's case. Appellant did not introduce any particular matters in extenuation or mitigation, but instead offered letters and statements that generally portrayed Appellant in a positive light, including four character letters,

a letter of appreciation, statements from his family and friends, and a personal statement.

The third factor—the materiality of the evidence in question—weighs in favor of finding that Appellant was prejudiced. The challenged video contained a slideshow of pictures accompanied by background music, including pictures of the victim as a child, throughout his life, and finally, of his gravestone. All but one of these pictures had not been admitted into evidence and would not have been seen by the panel members but for the military judge's error in allowing the video to be shown and taken into the panel deliberations. The pictures, coupled with the background music, were no doubt intended to evoke a strong emotional response from the panel.[5] Seeing the victim's father cry into the uniform of his deceased son was likely heart-wrenching, and it is the type of content that had the potential to influence the sentencing decision of the panel.

The fourth factor—the quality of the evidence in question—also weighs in favor of Appellant. The Government used its resources to produce a video on behalf of the victim's family that was designed to evoke an emotional response from the panel. Trial counsel selected and compiled the photographs, recorded two interviews with the victim's parents, found and selected background music, and then edited all of those elements together. This was likely a time-intensive process that resulted in an emotionally moving video that the Government intended to influence Appellant's sentence.

Our conclusions about the materiality and quality of the video are bolstered by the way the Government used the video during sentencing. *See United States v. Washington*, 80 M.J. 106, 111 (C.A.A.F. 2020) (noting that two relevant factors in assessing materiality and quality are "the extent to which the evidence contributed to the government's case" and "the ex-

---

[5] Although the military judge determined that *the music* did not evoke "emotions of sadness or sorrow or despair" and that the *pictures and discussion* were "not intended [to] and will not and would not inflame the passions of the members," this Court reviews the four prejudice factors de novo, and we conclude that the video *as a whole* was material evidence that had a poignant quality.

tent to which the government referred to the evidence in argument"). Although the Government now characterizes the artistic elements of the video as a "distraction" and "not relevant," Gov't Br. at 38–39, the Government's actions during the court-martial tell a different story. In addition to producing the video and playing it for the panel, in full, after Airman Hale's father delivered his unsworn statement, trial counsel also played part of the video—the portion where the victim's father cried into his son's uniform—*again* at the crescendo of the trial counsel's sentencing argument, immediately before asking the panel to adjudge the maximum possible sentence. Contrary to the Government's argument's now, trial counsel's decision to replay the video in that moment is compelling evidence the Government believed the video was not only material and of high quality, but possibly the most powerful aspect of their sentencing case.

The fact that the panel took a copy of the video into the deliberation room—despite trial counsel's statement to the military judge during the motions hearing that this would not be the case—is also troubling. Of course, we cannot know how the panel used the video, or if they used it at all. But the fact that the panel had unfettered access to a video that, per the plain text of R.C.M. 1001A, they should have never seen, makes it even harder for the Government to prove that the video did not have a substantial influence on the adjudged sentence.

Although the first two factors weigh in favor of holding that Appellant was not prejudiced, the materiality and high quality of the video—as illustrated by the Government's use of the video during sentencing—prevent us from concluding that the Government has met its burden of establishing that the video did not substantially influence Appellant's sentence. Accordingly, we hold that Appellant suffered prejudice and the proper course is for Appellant to be resentenced.

### III. Judgment

The decision of the United States Air Force Court of Criminal Appeals is affirmed with respect to the findings but reversed with respect to the sentence. The record is returned to the Judge Advocate General of the Air Force for remand to

the Court of Criminal Appeals to either reassess the sentence based on the affirmed findings or order a sentence rehearing.

Chief Judge OHLSON, with whom Judge SPARKS joins, concurring in part and dissenting in part.

I agree with many of the key points addressed in the majority's well-crafted opinion. Most importantly, I concur with the majority's holding that: (a) because Rule for Courts-Martial (R.C.M.) 1001A(e) (2016 ed.) states that unsworn victim impact statements must be "oral, written, or both," the video presented to the panel members in the instant case violated the plain language of the rule because it included music and photographs; and (b) "[t]he right to make an unsworn statement solely belongs to the victim or the victim's designee and cannot be transferred to trial counsel," as seemingly happened here. *United States v. Edwards*, __ M.J. __ (2) (C.A.A.F. 2022). Where I part ways with the majority is simply on the issue of whether Appellant suffered prejudice as a result of the improper admission of the video. For the reasons cited below, I believe the Government met its burden of demonstrating the harmlessness of this improper sentencing material. Consequently, I would uphold the sentence imposed on Appellant, and thus, I respectfully dissent.

As noted in the majority opinion, the essential question posed by the improper introduction of the video during Appellant's court-martial "is whether the error substantially influenced the adjudged sentence." *United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018) (internal quotation marks omitted) (quoting *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009)). This nonconstitutional harmlessness test assesses "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (internal quotation marks omitted) (quoting *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017)).

I agree with the majority's conclusions regarding the first two prongs of the *Barker* test: the Government's sentencing case was strong and the Appellant's sentencing case was weak. However, I have a different view regarding the third and fourth prongs. From my perspective, the materiality and quality of the improperly admitted video did not rise to such a level that the Government was precluded from meeting its burden of demonstrating harmlessness. Specifically, I believe

that any prejudice to Appellant caused by the video was almost entirely negated by the fact that it was cumulative of the properly admitted victim impact evidence. Thus, I conclude that the military judge's abuse of discretion in admitting the video was ultimately harmless.

In demonstrating this point, it is necessary to recount in detail the poignant and compelling evidence that was *properly* admitted by the military judge for the panel's consideration during sentencing.

The victim's mother provided emotional sworn testimony regarding her "very high hopes and very high aspirations" for the victim's life, his "easy-going, very curious" nature as a baby, his close relationship with "his little brother . . . , like two peas in a pod," his "passion" for reading, his musical talent, his "love for the Air Force" and the adversity he overcame in joining it, her pride that he had begun to grow as a person and "to look like . . . a man" during his time in the Air Force, and her feeling that "the biggest and best part of [her] was ripped from [her]" when she found out he had been killed.

These points were bolstered by the simultaneous slideshow presentation of at least seven photographs of the victim at various stages of his life.[1]

The victim's father testified similarly, with even greater reliance on the slideshow photographs, recounting the victim as a happy, athletic child, the family's Christmases together, the victim's "first day of school," his deep-sea fishing trip with the victim, the victim's time "in the marching band" throughout high school, teaching the victim how "to do his own [car] maintenance" and a particular car they "both worked on," the victim's desire "to fly" and join the Air Force, the victim's excitement upon graduating from basic training, the fact that the victim was "looking forward to his future," the military honors at his son's funeral,[2] his younger son's reaction to the

---

[1] These photographs showed the victim as a newborn, playing with his brother and their dog, standing with his bass clarinet, hiking with some friends in Guam (where he was stationed), and posing in uniform with what his mother described as his signature "smirk."

[2] As the victim's father described it:

victim's death, his last conversation with the victim, and the emotional turmoil he suffered in processing the victim's death.

During the presentation of these statements, trial counsel displayed and questioned the victim's father about at least fifteen different photographs of the victim, including one where the victim's father is shown holding up a piece of the victim's uniform.[3]

The victim's maternal aunt testified that the family "does not feel whole" and described the impact of the victim's death on his mother: "She is not the same, she used to be happy and bubbly and now she is just sad a lot. . . . She has a lot of nightmares. I can't get her to go and do some of the things that we used to do. She is not the same."

---

> The patriot guard, everybody was there . . . . He arrived at Bush Intercontinental and the military was there with honors. They kept everybody on the plane . . . until after [the victim] was off. The military was there and marched and picked him up and put him in the hearse and then we were all escorted to the funeral home. . . . [W]e had patriot guard, police everywhere, I had a lot of friends [that] are in the police department and they actually offered their time without being paid . . . . We probably had . . . 25 police cars there. They actually shut down I-45 which is a 6-lane highway . . . . I have never seen that unless it was [for] the President and they blocked it down for . . . about 30 miles and at the burial site they did the honor guard, the shots fired.

[3] The other photographs showed the victim posing in portraits as a young child, celebrating Christmas with his brother and father, playing with toys, standing with his backpack and lunch bag on his first day of school, holding up a fish he had caught, playing his bass clarinet with his father, and posing in his baseball uniform. Other photographs showed the victim's father posing with a framed photograph of the victim and his brother as young children, a Camaro that served as a project car for the victim and his father, and a banner reflecting the victim's and the victim's brother's military service.

A high school friend of the victim gave sworn testimony describing the impact on the victim's friends and their attempts to process the victim's death: "We definitely talk about it a lot, we try to support each other."

The victim's paternal aunt gave sworn testimony about the victim and the impact of his death, describing him as "so sweet, so polite, always so well-mannered . . . . very considerate, [and] very caring" with an unforgettable smile. She also told the members that the impact on her brother—the victim's father—had been "[a]bsolutely devastating," and that, while she had previously seen her brother cry "two or three times" in her "entire life," she now had "seen him cry so much." She further stated: "It has impacted the whole family . . . . There are plenty of days that I think we have all . . . just tr[ied] to be in denial so he can be here one more time."

The victim's commander testified to the victim's service history and the impact of his death on his fellow airmen, describing the "general disbelief and shock" that the victim's death engendered in the squadron and the "very close" relationships that members of the victim's unit have with each other. The victim's commander noted that "several members of the unit . . . were struggling with [the victim's] death, they were . . . significantly impacted and although this [funeral] service provided some closure to some members, we still had individuals [take] much longer to deal with the loss of [the victim]. Some members are still struggling today."

In sum, the Government properly presented agonizing, emotional, detailed testimony, complete with photographs (which were themselves admitted into evidence) that, as a whole, produced an effect substantially the same as that created by the video. The combined effect of this evidence was to overshadow what otherwise may have been an overly impactful video presentation. Stated differently, the improperly admitted video was effectively cumulative of the properly admitted sentencing evidence. Therefore, from my perspective, the error of introducing the video did not "substantially influence[] the adjudged sentence." *Barker*, 77 M.J. at 384 (internal quotation marks omitted) (quoting *Sanders*, 67 M.J. at 346).

Because I agree with the majority that the Government's sentencing case was strong and the Appellant's sentencing case was weak, and because I view the materiality and quality of the video statement as essentially neutral factors, I would hold that the Government met its burden to show that the military judge's error in allowing the video statement to be presented was harmless. Accordingly, I would uphold the sentence imposed on Appellant. Therefore, I respectfully dissent.