# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40407**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Zackery A. LOGAN**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 29 July 2024

————————————

*Military Judge*: Mark F. Rosenow.

*Sentence*: Sentence adjudged 30 June 2022 by GCM convened at McConnell Air Force Base, Kansas. Sentence entered by military judge on 10 September 2022: Bad-conduct discharge, confinement for 1 year and 6 months, reduction to E-1, and forfeiture of all pay and allowances.

*For Appellant*: Major Jenna M. Arroyo, USAF; Captain Trevor N. Ward, USAF; Scott R. Hockenberry, Esquire.

*For Appellee*: Lieutenant Colonel J. Peter Ferrell, USAF; Major Vanessa Bairos, USAF; Major Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GRUEN, and WARREN, *Appellate Military Judges*.

Judge WARREN delivered the opinion of the court, in which Chief Judge JOHNSON and Judge GRUEN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

WARREN, Judge:

At a general court-martial, a military judge convicted Appellant, consistent with his pleas, pursuant to a plea agreement, of one specification of assault

consummated by a battery of his wife, KL (by striking her face with his hand), one specification of aggravated assault against KL (by strangling her), and two specifications of assault consummated by a battery of his seven-year-old son, TL (by unlawfully using his hand to cause his son to strike his face with his own hand, and striking his son's face with Appellant's hand), all in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[1,2]

A panel of officer and enlisted members then sentenced Appellant, within the agreed-upon sentencing parameters of Appellant's plea agreement, to a bad-conduct discharge, confinement for one year and six months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority took no action on the findings, but suspended Appellant's reduction in grade for six months, with the reduction in grade then remitting at the end of the suspension period. The convening authority also suspended the adjudged total forfeitures of pay and allowances for six months while also waiving the resulting automatic forfeitures of all pay and allowances for a period of six months for the benefit of Appellant's spouse and two minor children.

Appellant raises seven issues on appeal (some of which we have reworded): (1) whether Appellant's guilty pleas to assault consummated by a battery for striking and strangling his wife were improvident where Appellant's responses during the plea inquiry raised the affirmative defenses of duress and necessity; (2) whether Appellant's guilty pleas generally were improvident because the military judge failed to evaluate the viability of a mental responsibility defense; (3) "whether Appellant's pleas were improvident because the military judge failed to adequately advise Appellant on waiver of his right to trial by members[;]" (4) "whether Appellant knowingly and understandingly elected a military judge alone forum for the purposes of findings[;]" (5) whether the military judge plainly erred by not assembling the court-martial prior to entering findings on Appellant's guilty pleas; (6) whether trial counsel engaged in improper sentencing argument by contradicting the stipulation of fact; and (7) whether the military judge abused his discretion by designating the

---

[1] Based upon the date of the underlying misconduct and referral of charges, all references in this opinion to the UCMJ, the Military Rules of Evidence (Mil. R. Evid.), and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] A total of two charges consisting of six total specifications were referred against Appellant. Pursuant to the plea agreement, the convening authority dismissed the remaining two specifications with prejudice after the entry of sentence for the offenses to which Appellant pleaded guilty.

complainant's father as a crime victim and permitting him to provide victim impact evidence during sentencing.[3]

As to all of Appellant's issues, we find no error that materially prejudiced his substantial rights and affirm the findings and sentence.

## I. BACKGROUND

Appellant and KL began dating in high school. KL gave birth to their first son, TL, in April 2012. Appellant married KL in May 2012, shortly after graduating from high school. Appellant enlisted in the Air Force in July 2012 at age 18. The couple's second son, OL, was born in 2015.

Turning to the convicted misconduct in this case, we will discuss the specifications in chronological order. Appellant pleaded guilty to committing battery against his son, TL, on 25 March 2019 and again sometime between August and September 2020. TL was 6 years old at the time of the first incident and 8 years old at the time of the second. TL has an attention disorder and an Individualized Education Plan to assist him at school.

The first incident occurred after TL received an unfavorable progress report at school for not raising his hand before commenting in class. After Appellant brought TL home, Appellant grew frustrated when TL continued to say "I don't know" when speaking about the incident. In response, Appellant used unlawful force causing TL to strike his own face with his own hand. This left bruising on TL's arms where Appellant grabbed him and on TL's face where TL struck himself. TL's teacher noticed the bruising at school the next day and reported it to military law enforcement at McConnell Air Force Base, who initiated an investigation. During a subsequent interview with military law enforcement, Appellant admitted to striking TL as set forth above.

Appellant initially received a Letter of Reprimand for this incident in June 2019, in which he apologized for striking his son and promised similar conduct would never happen again.[4] Nonetheless, approximately 18 months later, it did.

The second incident occurred in August/September 2020 when Appellant again became frustrated with TL and struck him in the face with Appellant's hand causing swelling and bruising on TL's forehead above his left eye.

---

[3] Appellant personally raises this issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] The LOR was later withdrawn after charges were preferred against Appellant for the same misconduct. The LOR and response were admitted into evidence at trial as one of the attachments to Appellant's stipulation of fact.

Appellant admitted during his guilty plea inquiry that he had no legitimate parental disciplinary reason to strike TL on either occasion.

Appellant slapped and strangled his wife, KL, on 28 December 2020, during a heated emotional exchange after KL discovered a picture of another woman on Appellant's phone. On that date, the family was driving to Appellant's mother's house for a holiday visit with KL in the front passenger seat and TL and OL in the back seat. When KL confronted Appellant, Appellant admitted his infidelity and said he wanted a divorce. KL was emotionally distraught at this revelation. She started to engage in erratic behavior as the couple continued to argue while driving. At one point, KL made a suicidal ideation to the effect, "I don't want to be here anymore. I don't want to live anymore."

For the next several minutes, KL repeatedly tried to open the passenger door and jump out of the vehicle while moving at highway speeds. Appellant stopped the vehicle periodically for the couple to continue their argument in more relative safety. KL attempted to run out onto the busy highway multiple times but Appellant grabbed and pushed her back to the car. None of this physical touching was charged as battery. Instead, Appellant was charged with battery for smacking KL in the face (with a force of six on a ten-point scale by his own admission) after he had retrieved her and placed her in the passenger seat.

Appellant strangled KL shortly after he struck her in the face. Appellant stipulated he did so because she continued to threaten suicide while the children were in the back seat and able to hear her. Appellant strangled her for at least five seconds and used such force during the strangulation that she began to lose consciousness and see stars. Around the time he stopped strangling KL, a stranger approached them and offered assistance.

## II. DISCUSSION

### A. Providency of Appellant's Guilty Pleas

Appellant claims his pleas were improvident because his colloquy with the military judge reasonably raised: (1) a duress defense under Rule for Courts-Martial (R.C.M.) 916(h); (2) a "necessity" defense not specifically provided for in the Rules for Courts-Martial; and (3) a mental responsibility defense arising from Appellant's discussion in his unsworn statement of his childhood trauma stemming from emotional abuse and depression, none of which, in Appellant's view, the military judge directly addressed during the trial. For the reasons set forth below, we conclude the military judge's plea colloquy with Appellant substantially addressed and eliminated any reasonable applicability of a duress or necessity defense. We further conclude no facts at trial reasonably raised a mental responsibility defense, nor undercut the presumption Appellant was legally competent to stand trial.

### 1. Additional Background

On 23 June 2022, Appellant entered into a plea agreement wherein he agreed to plead guilty to the four specifications identified *supra*. In exchange for his guilty pleas, Appellant agreed to enter into a reasonable stipulation of fact as to the charged misconduct and surrounding circumstances. The convening authority and Appellant also agreed the sentence adjudged by the court-martial must include confinement of no less than one year and no more than five years with no other limitations on the sentence.

Before the providency inquiry, the military judge summarized the R.C.M. 802 conferences between counsel and the military judge leading up to trial. He noted, "No concerns were raised to my attention about [Appellant's] ability to fully participate in these proceedings or focus on these proceedings and meaningfully participate in his defense." Neither trial counsel nor trial defense counsel made any corrections or additions to this summary. Relatedly, there is no evidence in the record that Appellant ever requested an inquiry into his mental condition pursuant to R.C.M. 706.

At trial, Appellant admitted to the following language in the stipulation of fact pertaining to striking KL in her face:

> When [Appellant] struck [KL] in the face, he did so with unlawful force or violence, which caused her bodily harm. [KL] did not consent to being struck in the face by [Appellant]. No one gave [Appellant] authority to strike [KL] in the face. No one and nothing forced [Appellant] to strike [KL] in the face. [Appellant] could have avoided striking [KL] in the face if he wanted to. When [Appellant] struck [KL] in the face, he did not have a reasonable belief that physical harm was about to be inflicted on himself or another person. [Appellant] did not believe [KL] was about to assault anyone. [Appellant] does not believe he has any legal justification or excuse for striking [KL] in the face.

In the same stipulation, Appellant stipulated to the following pertaining to his strangling of KL:

> [Appellant] caused bodily harm to [KL] by strangling her. [KL] did not consent to being strangled by [Appellant]. No one gave [Appellant] authority to strangle [KL]. No one and nothing forced [Appellant] to strangle [KL]. [Appellant] could have avoided strangling [KL] if he wanted to. When [Appellant] strangled [KL], he did not have a reasonable belief that physical harm was about to be inflicted on him or another person. [Appellant] did not believe [KL] was about to assault anyone. [Appellant]

does not believe he had any legal justification or excuse for strangling [KL].

The military judge inquired as to the accuracy of the stipulation of fact and whether Appellant knowingly and voluntarily agreed to those facts. After this inquiry, the military judge specifically advised Appellant that he should be prepared to discuss during the providency inquiry how a "justification" defense under R.C.M. 916(c) might or might not apply in his case. The military judge specifically advised:

> I would draw the parties' attention and the [D]efense's attention to R.C.M. 916(c). I think you are very well oriented to the idea of justification already. The way that these facts are explained inside the stipulation, there need[s] to be in my measure a conversation with the accused about whether or not the force that he applied to his then spouse was with the goal of providing for her safety and providing for the safety of others. You all have . . . a lot of discussion about self-defense or defense of another; but in terms of justification, there is a different kind that needs to be ruled out if I could call what the accused did as unlawful.

During the providency inquiry, the military judge explained the elements of each offense to Appellant who affirmed his understanding of these elements. With particular regard to the offenses dealing with assault consummated by a battery and aggravated assault (via strangling) against KL, the military judge specifically advised Appellant:

> It is also not a battery to touch another to attract the other's attention or to prevent injury. While some amount of restraint to prevent injury or to provide for the safety of the victim or others may be lawful, an excessive amount of force even under these circumstances constitutes a battery.

Appellant disclaimed any defense that striking KL in the face or strangling her were necessary to avoid her harming herself. More specifically, Appellant explained prior to any follow up questioning by the military judge: "*Unlike my other actions*[, *i.e.*, restraining KL from running into traffic and leaping out of the car while it was traveling down the highway,] the slap was not necessary for her to stop attempting to hurt herself." (Emphasis added). The military judge and Appellant then engaged in a colloquy as to why Appellant struck KL in the face:

> [Military Judge (MJ)]: You said it was different than some of the other touchings that you described that were premised or focused on keeping her safe. What was different about this slap?

[Appellant]: She was sitting [in] the passenger seat. She wasn't attempting to get out at that point. She wasn't . . . making any moves to go towards the highway.

MJ: You will recall that I explained to you that in some circumstances, there is an amount of restraint that could be required to prevent injury or to provide for the safety of a victim or others. In such circumstances, the touching involved could be considered lawful. Do you remember my explanation of this to you?

[Appellant]: Yes, Your Honor.

MJ: I further explained to you that an excessive amount of force, even under such circumstances, would constitute a battery, and battery is what I have defined for you. Do you agree that slapping her on the face was an excessive amount of force under those circumstances, such that it constituted a battery?

[Appellant]: Yes, Your Honor.

. . . .

MJ: Is it fair to say that this was prompted by frustration, anger, [or] something else? You tell me.

[Appellant]: Out of frustration and anger.

Appellant then affirmed he had other options available to accomplish his purported goal of getting KL to regain her composure. He conceded: "I could have waited to see if she would have calmed down on her own. I could have also tried to call for help, either calling 9-1-1 or calling the police."

In response to a specific question from the military judge as to why Appellant strangled KL, Appellant admitted: "I was just angry and frustrated and trying to get her to just stop talking about hurting herself in front of the kids." Appellant confirmed, in response to direct questions from the military judge, that he did not have any "legal justification or excuse" for either striking KL in the face or strangling her.

Finally, during his oral unsworn statement, Appellant told the court members he endured significant emotional turmoil during his childhood owing to his father's domestic violence against his mother, his parents' subsequent divorce, his mother's subsequent cancer diagnosis and his feelings of isolation and hopelessness as he tried to care for her. According to Appellant, this sense of despair led him to attempt suicide twice by the age of 13 (circa 2007). Appellant's mother eventually re-married. Appellant described his high school years as an improvement with him meeting KL, graduating on time, and enlisting in the United States Air Force. Unfortunately, Appellant's brother committed suicide while Appellant was in basic training and the sorrowful news of his

brother's death further impacted Appellant. He asserted he was "diagnosed with depression and later anxiety" and "prescribed anti-depressant and anti-anxiety medications." Appellant further asserted he received mental health counseling while in the military, where he discovered he had significant anger management issues and what Appellant identified (without supporting proof or corroboration of diagnosis) as "PTSD from [his] childhood." Appellant reiterated throughout his unsworn statement that he accepted "full responsibility for [his] choices" and none of his personal history excused his misconduct.

### 2. Law

#### a. Providency, Generally

Appellate courts "review a military judge's decision to accept a guilty plea for an abuse of discretion and questions of law arising from the guilty plea de novo." *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008); *United States v. Shaw*, 64 M.J. 460, 462 (C.A.A.F. 2007). "The military judge must ensure there is a basis in law and fact to support the plea to the offense charged." *United States v. Soto*, 69 M.J. 304, 307 (C.A.A.F. 2011) (citing *Inabinette*, 66 M.J. at 321–22) (additional citation omitted). For a provident plea, "a military judge must elicit actual facts from an accused and not merely legal conclusions." *United States v. Price*, 76 M.J. 136, 138 (C.A.A.F. 2017).

A military judge must resolve any apparent inconsistency based upon an applicable affirmative defense prior to accepting the guilty plea. Article 45(a), UCMJ, 10 U.S.C. § 845(a); *United States v. Hayes*, 70 M.J. 454, 458 (C.A.A.F. 2012). However, "not every mitigating statement or word requires further inquiry." *Hayes*, 70 M.J. at 458. "[A] military judge is not required to reopen a plea and inquire further where an accused raise[s] the 'mere possibility of a defense.'" *Id.* (citing *Shaw*, 46 M.J. at 462) (holding that Hayes's statements during his unsworn statement about his mother's suicidal ideations did no more than raise the mere possibility of a duress defense).

An appellant bears the burden of establishing that the record shows "a substantial basis in law or fact to question the plea." *United States v. Phillips*, 74 M.J. 20, 21–22 (C.A.A.F. 2015) (citation omitted). Reviewing appellate military courts will only set aside a guilty plea where they find a substantial conflict between the pleas and the appellant's statements or other evidence of record. *Shaw*, 64 M.J. at 462. Prior to overturning a guilty plea, a reviewing military appellate court must find "something in the record of trial, with regard to the factual basis or the law, that would raise a *substantial question* regarding the appellant's guilty plea." *Inabinette*, 66 M.J. at 322 (emphasis added).

#### b. Duress Defense

The defense of "duress" applies when:

the accused's participation in the offense was caused by a reasonable apprehension that the accused or another innocent person would be immediately killed or would immediately suffer serious bodily injury if the accused did not commit the act. *The apprehension must reasonably continue throughout the commission of the act*. If the accused had any reasonable opportunity to avoid committing the act without subjecting the accused or another innocent person to the harm threatened, this defense shall not apply.

R.C.M. 916(h) (emphasis added).

The defense of duress has three fundamental components: (1) immediacy between an appellant's actions and the perceived threat; (2) continuation of immediacy throughout the conduct in question; and (3) lack of opportunity to avoid the harm threatened by any other reasonably available means. *Hayes*, 70 M.J. at 459–60. "[A] threat of suicide c[an] provide the basis for a duress defense" when these components are present. *Id.* at 461.

### c. Necessity Defense

"Necessity" is a defense recognized in federal civilian common law as "available to one who intentionally causes a harm or evil contemplated by an offense, provided that the justifying circumstances result in lesser net harm or evil as intended by the actor." *United States v. Olinger*, 50 M.J. 365, 366 (C.A.A.F. 1999) (citation omitted). However, the necessity defense is *not* an enumerated defense listed within R.C.M. 916. In *Olinger*, the court characterized duress under R.C.M. 916(h) as a "somewhat narrower defense" than the version of the necessity defense recognized in some federal caselaw, but found an "insufficient basis for considering whether [military] law should be interpreted or extended" to include a broader necessity defense because the accused offered only "vague speculation" to support the purported necessity of his unauthorized absence to care for his wife who suffered from depression. *Id.* at 366–67.[5]

Relatedly, R.C.M. 916(c) enumerates a general "justification" defense where "death, injury, or other act caused or done in the proper performance of

---

[5] While the United States Court of Appeals for the Armed Forces in *Olinger* declined to squarely rule upon whether the "common law" defense of necessity applied in a court-martial, the court nonetheless showed great reticence in recognizing a "necessity" defense in a military context, quoting and citing to *United States v. Banks*, 37 M.J. 700, 702 (A.C.M.R. 1993), for the proposition that "[r]ejecting the necessity defense goes to the core of discipline within a military organization. In no other segment of our society is it more important to have a single enforceable set of standards." *Olinger*, 50 M.J. at 366–67. We, like our superior court, remain dubious as to whether "necessity" is a viable defense at courts-martial.

a legal duty is justified and not unlawful." In the Article 128, UCMJ, context, it is "not a battery to touch another to attract the other's attention or to prevent injury." *Manual for Courts-Martial, United States* (2019 ed.), part IV, ¶ 77.c(3)(d).

### d. Lack of Mental Responsibility Defense

An accused may not be tried by court-martial "if that person is presently suffering from a mental disease or defect rendering him or her mentally incompetent to the extent that he or she is unable to understand the nature of the proceedings against them or to conduct or cooperate intelligently in the defense of the case." R.C.M. 909(a). "[S]evere mental disease or defect" does not include "minor disorders such as nonpsychotic behavior disorders and personality defects." R.C.M. 706(c)(2)(A).

An accused's mental capacity to stand trial is presumed unless the contrary is established by a preponderance of the evidence. R.C.M. 909(b), (e)(2). However,

> [s]hould the accused's statements or material in the record indicate a history of mental disease or defect on the part of the accused, the military judge must determine whether that information raises either a conflict with the plea and thus the possibility of a defense or only the "mere possibility" of conflict. . . . [I]t is prudent, but . . . not always required, to conduct further inquiry when a significant mental health issue is raised, regardless of whether a conflict has actually arisen.

*United States v. Riddle*, 67 M.J. 335, 338–39 (C.A.A.F. 2009).

Relatedly, the affirmative defense of lack of mental responsibility requires the accused to prove by clear and convincing evidence (1) the accused suffered from a "severe mental disease or defect" at the time of the offense, and (2) as a result, the accused was "unable to appreciate" either the "nature and quality" of his acts or their "wrongfulness." Article 50a, UCMJ, 10 U.S.C. § 850a; *see also* R.C.M. 916(k)(3)(A) ("[An] accused is presumed to have been mentally responsible at the time of the alleged offense[,] . . . [u]ntil the accused establishes, by clear and convincing evidence, that he [ ] was not mentally responsible at the time of the alleged offense.").

### 2. Analysis

Appellant fails to carry his burden to demonstrate a substantial basis in law or fact to question his plea. *See Phillips*, 74 M.J. at 21–22. Appellant's arguments that the military judge erred in not resolving potential duress, necessity, and mental responsibility defenses in his case fail because, considering the entirety of the evidence before the military judge, the facts and

circumstances at most raised the "mere possibility" of any of these defenses. *See Hayes*, 70 M.J. at 462. This is insufficient for relief.

### a. Duress and Necessity Defenses

In Appellant's stipulation of fact, he expressly acknowledged he had no "legal justification or excuse" for striking KL in the face or strangling her. Moreover, the military judge directly questioned Appellant during the providency inquiry about whether Appellant had any "legal justification or excuse" for this conduct. Appellant confirmed he did not.

Indeed, the military judge was well attuned throughout the court-martial to whether the circumstances of Appellant smacking and strangling KL raised any legally recognized defenses. Earlier in the proceedings, the military judge raised, sua sponte, the defense of justification under R.C.M. 916(c) after reviewing Appellant's stipulation of fact. The military judge advised the parties, "[T]here need[s] to be . . . a conversation with the accused" at the providency inquiry "about whether or not the force that he applied to his then spouse was with the goal of providing for her safety and providing for the safety of others." The military judge further advised the parties that the definition of battery excluded physical touching to attract another's attention or prevent injury. This subsumed the substance of any "duress" or "necessity" defenses which Appellant now claims pertain.

Furthermore, nothing within the military judge's plea colloquy with Appellant provided any substantial basis to question Appellant's concessions in the stipulation of fact that he had no legal justification or excuse for either his smacking or strangling KL. Appellant was not operating under "duress" when he smacked KL. Rather, he was, in his own words, acting out of "frustration and anger." He conceded KL was not in danger of harming herself in the moment he smacked her with a force of six on a ten-point scale. During his plea colloquy, Appellant linked that frustration and anger to his being physically and emotionally exhausted by KL's actions during the course of their argument. These concessions demonstrate any apprehension he had did not "continue throughout the commission of the act[s,]" as required for a duress defense. R.C.M. 916(h).

Similarly, as to the strangling incident, KL's apparent suicidal ideation did not create even the mere possibility of "duress." In this regard, Appellant's reliance upon *Hayes* for the proposition that a threatened suicide attempt could constitute grounds for duress is misplaced as there was no immediacy between Appellant's actions and the threat he claims he perceived. Appellant's strangling was *not* an effort to keep her from killing herself, but rather to keep her from speaking. Specifically, Appellant did not want KL to continue her anguished laments of "I don't want to be here. I don't want to live anymore" within earshot of their sons.

Moreover, the law is unclear as to whether the military justice system even recognizes a defense of necessity that is not specifically provided for in the Rules for Courts-Martial. Appellant concedes as much in his opening brief when he acknowledged this "remains an unsettled question." In any event, there is no basis to consider the application of such a defense in Appellant's case because his hitting and strangling his wife were not acts justified by a need to prevent any greater harm or evil. *See Olinger*, 50 M.J. at 366.

Considering the totality of the evidence admitted at trial, including Appellant's providency inquiry, there was no substantial basis in law or fact for the military judge to conduct any further inquiry with Appellant on any putative "duress" or "necessity" defense.

### b. Lack of Mental Responsibility Defense

We hold Appellant's unsworn declaration asserting ongoing depression from childhood emotional distress did not raise any conflict with his guilty pleas. Under the circumstances, no further inquiry from the military judge was necessary to assure the providency of Appellant's guilty pleas.

Notably, the affirmative defense of lack of mental responsibility requires a showing by clear and convincing evidence that the accused is "unable to appreciate the nature and quality or the wrongfulness of his . . . acts." R.C.M. 916(k)(1). Appellant does not come close to satisfying this standard.

First, the source of the information for the purported mental irresponsibility defense was limited to Appellant's unsworn statement during presentencing, which was not under oath and therefore not evidence. *See United States v. Marsh*, 70 M.J. 101, 104–05 (C.A.A.F. 2011) ("The truth of the matter is that these statements are <u>not</u> made under oath and, thus, the 'unsworn statement is not evidence.'") (citation omitted)). Under similar circumstances, our superior court has concluded such uncorroborated claims do not by themselves necessitate further inquiry from the military judge. *See Shaw*, 64 M.J. at 462–63.

Here, there was no evidence admitted formally to document any severe mental disease or defect of Appellant at trial. Appellant's trial defense counsel did not request an inquiry into his mental capacity or mental responsibility, pursuant to R.C.M. 706. Even assuming, *arguendo*, that Appellant's generic reference in his unsworn statement to his depression and anxiety (animated by childhood emotional distress and two putative suicide attempts 12–13 years prior to the charged misconduct) qualified as a "severe mental disease or defect" at the time of the charged offenses, there was no information in the record that this condition rendered Appellant unable to appreciate "the nature and quality or the wrongfulness of [his] acts." *See Riddle*, 67 M.J. at 339–40 (no further inquiry required for "mere possibility" of mental irresponsibility from

bipolar and borderline personality disorder, severe depression diagnosis, ongoing impatient psychiatric care, and two suicide attempts between offenses and court-martial); *Shaw*, 64 M.J. at 464 (holding military judge did not abuse his discretion in not conducting further inquiry where reference to history of bipolar disorder in unsworn statement raised only "'mere possibility' of a conflict with the plea").

Under these circumstances, Appellant's unsworn statement raised a matter for the court members to take under advisement at sentencing as potential mitigating evidence but did not provide a "substantial basis" to undercut the validity of his guilty plea.

**B. Prosecutorial Misconduct (Trial Counsel Sentencing Argument)**

Appellant asserts trial counsel engaged in improper sentencing argument amounting to prosecutorial misconduct by misrepresenting stipulated facts regarding how long Appellant strangled KL. Specifically, Appellant challenges trial counsel's remark during sentencing argument that "[t]he only thing that stopped the accused from strangling [KL] to death was the stranger that pulled up that noticed something was wrong with that situation and stopped to intervene." Appellant argues this contradicted and was not a reasonable inference to draw from the stipulated facts in this case.

**1. Additional Background**

The stipulation of fact recites that *"[a]fter the strangulation*, a stranger pulled up behind [KL and Appellant] to see if they needed help." (Emphasis added). During the plea colloquy, Appellant described the same scene this way: "I did not hold my hand on her throat for very long, maybe five seconds. When it seemed like she relaxed, I let go. *Around that time,* a stranger pulled up behind us and asked us if everything was okay." (Emphasis added).

Trial counsel briefly addressed this sequence of events during her sentencing argument with a brief remark that only the stranger's intervention prevented Appellant from strangling KL to death. This covers less than 3 of 110 lines of trial counsel's argument in the trial transcript.

Trial defense counsel did not object, but instead reframed the issue during her own sentencing argument by asserting: "[C]ontrary to what you just heard that the only thing that stopped him from killing her was a stranger arriving. Not the case. He stopped in that moment."

The military judge did not sua sponte issue any tailored instructions as to this portion of trial counsel's sentencing argument. However, the military judge's sentencing instructions reminded the members: "[T]he arguments of the trial counsel and her recommendations are only her individual suggestions and may not be considered as the recommendation or opinion of anyone other than such counsel." The military judge further instructed: "[A]rgument by

counsel is not evidence. Counsel are not witnesses. If the facts as you remember them differ from the way counsel state the facts, it is always your memory of the facts that controls."

### 2. Law

The issue of "[i]mproper argument is a question of law that we review de novo." *Marsh*, 70 M.J. at 104 (citation omitted). When an appellant fails to object to the prosecution's sentencing argument at trial, this court reviews only for plain error. *See United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007). The burden is on the appellant to demonstrate: (1) error; (2) that was plain or obvious; and (3) prejudiced the appellant's substantial rights. *United States v. Palacios Cueto*, 82 M.J. 333, 333–34 (C.A.A.F. 2022) (citation omitted). "[T]he failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006).

"Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159–60 (C.A.A.F. 2014) (alteration in original) (quoting *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005)). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, [for example] . . . a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *Andrews*, 77 M.J. at 402 (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

"Improper argument is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted). "Where [such] argument occurs during the sentencing portion of the trial, we determine whether . . . we can be confident that [the appellant] was sentenced on the basis of the evidence alone." *United States v. Pabelona*, 76 M.J. 9, 12 (C.A.A.F. 2017) (second alteration in original) (quoting *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014)). This requires us to "look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013) (internal quotation marks and citations omitted). "[T]rial counsel may 'argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence.'" *Id.* at 479 (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)).

In evaluating prejudice from improper sentencing argument, reviewing courts consider: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Id.* at 480 (quoting *Fletcher*, 62 M.J. at 184).

The United States Court of Appeals for the Armed Forces (CAAF) has identified five indicators of severity:

> (1) the raw numbers—the instances of misconduct as compared to the overall length of the argument[;] (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations[;] and (5) whether the trial counsel abided by any rulings from the military judge.

*Fletcher*, 62 M.J. at 184 (citation omitted). The CAAF in *Halpin* applied these severity indicators to asserted improper sentencing argument. 71 M.J. at 480.

In assessing prejudice relating to improper sentencing arguments, "the lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2000) (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)). Moreover, effective counter-arguments by defense counsel at trial tend to mitigate prejudice to an accused. *See Palacios Cueto*, 82 M.J. at 335 (holding no prejudice where civilian defense counsel did not object but offered specific counter-arguments "effectively respond[ing] to most of what trial counsel said"). Finally, in terms of the effectiveness of curative measures, reviewing courts may consider not only tailored instructions provided by the military judge in direct response to the argument contested on appeal, but also consider the effectiveness of the standard instructions issued by the military judge relevant to the alleged erroneous argument. *See id.* (holding military judge's "complete and correct instructions" were themselves an effective curative measure).

### 3. Analysis

Assuming without deciding trial counsel's challenged sentencing argument was not a fair inference from the stipulated facts, we still find no prejudice in this brief misstatement of fact.

Any improper argument here was not severe. *See Fletcher*, 62 M.J. at 184. The trial counsel's brief mention of the bystander's intervention as possibly saving the victim's life consisted of less than 3 of 110 lines in the sentencing transcript. It was nowhere near the main crux of the Government's argument.

Appellant's trial defense counsel also used self-help measures to effectively cure any misconduct. *Id.* In particular, trial defense counsel reframed the issue in their own summation and used trial counsel's unconvincing inference as a sword against the credibility of trial counsel's argument and sentencing recommendation generally. The court members also had the stipulation of fact to review during their deliberations to assess trial counsel's remarks in proper context. Further, the military judge instructed the members: (1) arguments of

counsel are not fact, and (2) members alone determine the facts based upon their own evaluation of the admitted evidence. We conclude these standard instructions provided a curative effect. *See Palacios Cueto*, 82 M.J. at 335.

The weight of the sentencing evidence was also convincing enough to overshadow any fleeting inaccurate comment by trial counsel not supported by the stipulated facts. KL testified Appellant strangled her in the presence of their young sons with enough force that she "saw stars" and began to lose consciousness. The evidence also showed Appellant struck his son, TL, in the face in the first incident with enough force to leave a bruise for days noticed by the boy's teachers at school. The evidence further showed Appellant promised never to do it again but struck his son a second time approximately 17–18 months later, thereby demonstrating his diminished rehabilitative potential. The significance of the aggravating circumstances for the charged misconduct far overshadowed any fleeting inaccurate comment by trial counsel for stipulated facts. That is particularly so where trial defense counsel's sentencing argument ably re-framed trial counsel's arguably unreasonable inference from the stipulated fact. Finally, and perhaps most significantly, separate from the arguments of counsel the actual stipulated facts were directly accessible to the members via the written stipulation of fact—giving them the opportunity to directly evaluate the evidence for themselves. Therefore, we are satisfied Appellant was sentenced based upon the admitted sentencing evidence alone. *Halpin,* 71 M.J. at 480.

Finally, the relatively moderate sentence adjudged by the court members evidences the lack of prejudice in this case. The court members adjudged one year and six months of confinement although the minimum term was one year and trial counsel recommended five years. This relatively lenient sentence is some indication they were not unduly impacted by any erroneous argument. *Cf. United States v. Hamilton,* 78 M.J. 335, 343–44 (C.A.A.F. 2019) (finding no prejudice from improper sentencing evidence where appellant faced maximum 30 years confinement, agreed to five-year confinement limit in his plea agreement, but was sentenced to only two years).

## C. Aggravation Evidence from Testimony of ST (R.C.M. 1001(b)(4))

Appellant asserts the military judge abused his discretion in overruling trial defense counsel's objection to presentencing testimony introduced by the Government during their sentencing case in chief from KL's father and TL's grandfather, ST, as to ST's own emotional impact arising from Appellant's physical abuse of his family members. We find no error and agree with the trial court that ST's own emotional impact qualified as aggravation evidence under R.C.M. 1001(b)(4) because it directly related to and resulted from Appellant's crimes.

### 1. Additional Background

During the presentencing proceedings, the Government called KL's father, ST, to provide sworn testimony as to R.C.M. 1001(b)(4) aggravation evidence which ST directly observed and experienced. ST testified about a phone call in which an emotionally distraught and sobbing KL described Appellant's assault of her, particularly how Appellant strangled her to the point of near unconsciousness after she confronted Appellant about a picture she found of another woman on Appellant's phone. ST also described his perceptions of the physical and psychological effects of the abuse on KL and TL, which he personally observed when they came to live with him in the weeks after Appellant struck and strangled KL. ST explained how KL and TL had trouble sleeping and at times cried uncontrollably. In one incident, TL, through tears, told his grandfather, ST, he was crying because "I am thinking about the stuff my dad did to me." ST also witnessed TL act timidly around authority figures and show a nervous habit of chewing his fingernails. Another time, KL broke down "crying hysterically" in response to ST watching a television documentary concerning domestic violence. She retreated to her room sobbing and yelling for ST to turn it off because it was "making her relive things." All this testimony proceeded without any objection from trial defense counsel as to "improper" victim impact aggravation evidence.

However, in addition to ST's knowledge and observations of the emotional/psychological impact on KL and TL from Appellant's crimes, trial counsel sought to elicit from ST his *own* impact from those same crimes. In his final question to ST on direct examination, trial counsel asked ST if there was "anything else about the impacts of the accused's crimes on . . . *you* [ST] that you would like the members to know." ST answered, "It has been a difficult transition for us all. It has been very difficult for me as a father and as a grandfather." Trial defense counsel objected that this testimony was inadmissible based on "[i]mproper impact." In a subsequent Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, ST answered affirmatively to whether he "had been emotionally impacted by the accused's crimes" himself, saying "[i]t has been very difficult to see what my daughter and my grandsons have gone through, and the impact it has had on them."

The military judge overruled trial defense counsel's objection, finding:

> [A]s a matter of law . . . this father could be—and grandfather could be[—]a crime victim for the purposes of even the narrowed definitions within [R.C.M.] 1001(c). . . . I find that this evidence[,] because it does impact a victim, even under this narrower definition, is admissible evidence under [R.C.M.] 1001(b)(4) in the sense that it includes evidence of emotional impact upon an individual who is the victim of an offense

committed by the accused. That is a definition that comes from R.C.M. 1001(b)(4). Putting those things together I find that as a matter of law, he could be considered a crime victim within the sense that this is being offered under [R.C.M.] 1001(b)(4) evidence in aggravation.

The military judge further ruled, pursuant to Mil. R. Evid. 403, that ST's testimony was not substantially outweighed by any danger of unfair prejudice, confusion of the issues, waste of time, misleading of the members, or cumulativeness.

When the court members were recalled, ST testified: "It has been incredibly difficult and stressful to deal with the knowledge that my daughter and grandchild have been abused. It was very hurtful. If I am being honest, it makes me incredibly angry."

**2. Law**

This court reviews a military judge's decision to admit sentencing evidence for an abuse of discretion. *United States v. Barker*, 77 M.J. 377, 383 (C.A.A.F. 2018). We review the military judge's interpretation of the Rules for Courts-Martial de novo. *Id.* at 382. Admissions of evidence premised upon an "erroneous view of the law" qualify as abuse of discretion. *Id.* at 383 (citation omitted). A military judge also abuses his discretion when his decision is "outside of the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008) (citation omitted).

The prosecution may present evidence of "any aggravating circumstance directly relating to or resulting from the offenses of which the accused has been found guilty." R.C.M. 1001(b)(4). This "includes, but is not limited to, evidence of . . . social [or] psychological . . . impact or cost to any person or entity who was the victim of an offense committed by the accused." *Id.* While an accused is not liable for "a never-ending chain of causes and effects," *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995) (citation omitted), a full "assessment of the harm caused by" criminal conduct is "an important concern of the criminal law" to determine "appropriate punishment." *Payne v. Tennessee*, 501 U.S. 808, 819 (1991). In this regard, "evidence of the natural and probable consequences of the offenses of which an accused has been found guilty is ordinarily admissible at trial." *United States v. Stapp*, 60 M.J. 795, 800 (A. Ct. Crim. App. 2004) (citing *Rust*, 41 M.J. at 478), *aff'd*, 64 M.J. 179 (C.A.A.F. 2006).

The nexus necessary to qualify as "victim impact" evidence exists so long as the appellant's crimes were a significant factor contributing to that impact. *See United States v. Arroyo*, No. ACM 40321 (f rev), 2024 CCA LEXIS 242, at *15 (A.F. Ct. Crim. App. 18 Jun. 2024) (unpub. op.) ("Military judges must be

satisfied that the victim attributes the stated impact—at least in significant part—to the offenses of which the appellant was convicted.").

While R.C.M. 1001(b)(4) does not further define the meaning of "the victim of an offense committed by the accused," R.C.M. 1001(c)(2)(A) defines "victims" for purposes of making unsworn victim impact statements as any "individual who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty."

This court held in *United States v. Jones* that a witness need not qualify as a "victim" within the meaning of R.C.M. 1001(c)(2)(A) to provide sworn testimony as to "victim impact" under R.C.M. 1001(b)(4). No. ACM 39543, 2020 CCA LEXIS 207, at *75–76 (A.F. Ct. Crim. App. 11 Jun. 2020) (unpub. op.) (holding that the mothers of two child sexual assault victims who experienced "anger," "disgust," and "[emotional] devastation" directly resulting from Appellant's sexual abuse of their children did qualify to provide R.C.M. 1001(b)(4) victim impact testimony).[6]

Broadly speaking, witnesses other than the individual against whom the charged crime was committed can testify in aggravation about the crimes' impacts on themselves if they have suffered a specific harm involving a clear nexus between an accused's convicted offenses and the harm suffered. *See United States v. Bailey*, No. ACM 39935, 2021 CCA LEXIS 380, at *16–18 (A.F. Ct. Crim. App. 30 Jul. 2021) (unpub. op.) (holding without discussion that parents of the named crime victims qualified to provide R.C.M. 1001(c) victim unsworn statements); *United States v. Dunlap*, No. ACM 39567, 2020 CCA LEXIS 148, at *26 (A.F. Ct. Crim. App. 4 May 2020) (unpub. op.) (reasoning that "a parent responsible for the safety and well-being of children and who witnesses the suffering of those children may be harmed as much as, if not more than, the children themselves").

We are not alone in this approach. For decades, our superior court and sister service courts have consistently recognized that family members of named crime victims may themselves experience "victim impact" within the meaning of R.C.M. 1001(b)(4) when they suffer financial, social, psychological, or medical impact directly relating to or resulting from an accused's convicted misconduct. *See, e.g.*, *United States v. Ashby*, 68 M.J. 108, 119–20 (C.A.A.F. 2009)

---

[6] Indeed, even if our caselaw required a person to meet the statutory definition of crime victim in order to provide R.C.M. 1001(b)(4) aggravation evidence testimony, in construing the definition of "crime victim" for Article 6b, UCMJ, 10 U.S.C. § 806b, in a related context (*i.e.*, R.C.M. 1106A victim post-trial submission purposes), we concluded that a parent of a minor child may be designated as a "crime victim" because they too suffered an emotional and pecuniary harm from the convicted misconduct. *United States v. Schauer*, 83 M.J. 575, 579–80 (A.F. Ct. Crim. App. 2023).

(testimony of three family members of victims who died in Italian gondola crash for which appellant was convicted of obstructing justice by destroying videotape evidence of incident was relevant impact evidence on the effect the missing videotape had on the witnesses' ability to process their loss); *United States v. Wilson*, 35 M.J. 473, 476 (C.M.A. 1992) (evidence of psychological impact of family's frantic search for daughter on night appellant committed sex offense with child victim admissible because "evidence of the harm inflicted on the victim's family is an acknowledgement that the crime impacts society"); *United States v. Fontenot*, 29 M.J. 244, 251 (C.M.A. 1989) ("[T]he impact on the victim's family is yet another form of impact on the crime victim."); *United States v. Pearson*, 17 M.J. 149, 152–53 (C.M.A. 1984) ("[C]ourts-martial . . . can only make intelligent decisions about sentences when they are aware of the full measure of the loss suffered by all the victims, including the family and the close community."); *United States v. Thomas*, 43 M.J. 550 (N.M. Ct. Crim. App. 1995) (upholding admission of testimony regarding the impact of an adult woman's murder on her family), *rev'd in part and remanded in part on other grounds*, 46 M.J. 311 (C.A.A.F. 1997); *United States v. Whitehead*, 30 M.J. 1066, 1071 (A.C.M.R. 1992) (family of deceased soldier properly allowed to testify about crime's effect on them); *United States v. Law*, NMCCA 201100286, 2012 CCA LEXIS 358, at *7 (N.M. Ct. Crim. App. 21 Sep. 2012) (unpub. op.) (citations omitted) (holding that the coach and family members of an adult Marine complainant could be classified as victims).

### 3. Analysis

Appellant argues the military judge erred in admitting ST's testimony as to his own emotional impact from Appellant's crimes against KL and TL as R.C.M. 1001(b)(4) aggravation evidence because ST's emotional harm was not "directly relating to or resulting from" those crimes. We are unpersuaded.

Appellant argues that "no Court of Criminal Appeals has ever held that the parent of a non-murder, adult victim could be . . . designated [as a crime victim]." This argument appears to rest on the premise that only persons meeting the definition of "victim" under R.C.M. 1001(c) are competent to provide R.C.M. 1001(b)(4) evidence. Not so. Appellant's argument blurs the distinction between qualifying aggravating circumstances under R.C.M. 1001(b)(4) and persons qualifying as crime victims under R.C.M. 1001(c).

The *sine qua non* of aggravation testimony under R.C.M. 1001(b)(4) is not victim *status* (*i.e.*, being named as a specific crime victim for a convicted offense at the court-martial), but victim *impact*. Sufficient impact exists if the person testifying suffered (pertinent to this case) social or psychological impact directly relating to or resulting from an appellant's crimes. We are not treading upon uncharted territory here. As recited in the foregoing law section in this opinion, there is a wealth of military caselaw over decades holding that

parental figures, in particular, are competent to testify as to their own social and psychological impact when their child was the target of the underlying crime.[7] Applying that rationale to cover grandparents is hardly a leap of logic.[8]

Here, ST provided a specific factual nexus between his own psychological impact caused by his observations of and empathy for his daughter and grandson. He directly observed them coping with and demonstrating their own emotional impact from Appellant's physical abuse over a protracted period that ST called "very hurtful." ST further described the impact on *him* of witnessing their suffering, which in his words made him feel "incredibly angry." We hold ST's testimony established the necessary nexus between the psychological impact on ST and Appellant's crimes against ST's daughter and grandson.

## D. Forum Rights Advisement and Timing of Announcement of Assembly of the Court-Martial[9]

Appellant argues that his pleas were also improvident for structural reasons concerning the military judge's "inadequate" advice to Appellant as to his forum rights and as to the military judge's delay in announcing assembly of the court-martial. In summary Appellant argues: (1) the military judge "failed to adequately advise Appellant on waiver of his right to trial by members[;]" (2) the military judge failed to orient Appellant that notwithstanding Appellant electing court members as his court-martial forum, Appellant had, by pleading guilty to all contested charges and specifications,[10] in effect "elected a military judge alone forum for the purposes of findings;" and (3) the military

---

[7] We hasten to add that the military judge here applying an arguably heightened standard *(i.e.,* that ST met the definition of "crime victim" under R.C.M. 1001(c)(2)(A)) only strengthens the legal conclusion that ST was qualified to provide R.C.M. 1001(b)(4) aggravation evidence testimony as to his own psychological harm directly relating to and resulting from Appellant's crimes.

[8] To be clear, while our formulation here is arguably broad it is not limitless. Our holding today simply stands for the proposition that a parent and grandparent of a named crime victim can suffer their own "victim impact" within the meaning of R.C.M. 1001(b)(4) when they experience psychological harm *(i.e.* significant emotional distress) directly relating to and resulting from an appellant's convicted offenses. We reserve for another day whether others with close personal affinity and/or emotional connection to a named crime victim *(i.e.,* friends, significant others, extended family members, mentors) may suffer sufficient "vicarious trauma" from observing the suffering of the named crime victim that these observers themselves qualify to provide "victim impact" testimony under R.C.M. 1001(b)(4) as to their own impact.

[9] This section provides a combined analysis of Appellant's issues (3)–(5).

[10] As part of the plea agreement, the Government agreed to withdraw and dismiss with prejudice the only two specifications to which Appellant was pleading not guilty (the Specification of Charge I and Specification 4 of Charge II).

judge "plainly erred" by not assembling the court-martial prior to entering findings on Appellant's guilty pleas. We are unpersuaded.

We deem it appropriate to consolidate a summarized analysis of Appellant's interrelated legal challenges to the correct methodology involved for conducting guilty-plea inquiries in the context of a court-members sentencing case. Appellant's brief appears to fundamentally misapprehend the rules for conducting providency inquiries and assembling the court-marital in the context of a guilty plea in which Appellant elects court members as his forum for sentencing. The military judge fully explained Appellant's forum rights to him in an Article 39(a), UCMJ, session prior to Appellant entering his pleas. The military judge then provided an accurate description of the guilty plea inquiry process to Appellant in the same Article 39(a), UCMJ, session. The military judge explained Appellant was waiving three important rights: the right against self-incrimination, to a trial of facts on the specifications concerned, and to confront witnesses on the specifications concerned. The military judge also explained that if Appellant continued with his guilty plea the military judge would determine whether Appellant was guilty. Only a military judge could accept and determine the accuracy of an Appellant's guilty plea. *See* Article 39(a)(3), UCMJ, 10 U.S.C. § 839(a)(3); Article 45(b), UCMJ; 10 U.S.C. § 845(b); R.C.M. 910(c),(e). Furthermore, the providency inquiry must occur outside the presence of the court members. R.C.M. 901(e). Findings on a provident guilty plea (in cases where there are no remaining litigated specifications) must be entered by the military judge during an Article 39(a), UCMJ, session. R.C.M. 910(g).

Accordingly, contrary to Appellant's understanding, in the context of a guilty-plea case, even where an accused elects court members as his forum, it is improper to assemble those members prior to the military judge's providency determination. "When trial is by a court-martial with members, the court-martial is ordinarily assembled immediately after the members are sworn. The members are ordinarily sworn at the first session at which they appear[.]" *See* R.C.M. 911, Discussion.[11] Therefore, an appellant is not "deprived" of his forum choice of court members where the military judge alone determines the providency of an appellant's guilty pleas—rather, the Rules for Courts-Martial *require* the military judge to do that, and Appellant was informed accordingly at trial. In pleading guilty, Appellant waived a trial of the facts by a court-

---

[11] The structure of the Rules for Courts-Martial themselves also provide support for our analysis. Tellingly, R.C.M. 910, the rule concerning guilty pleas, appears sequentially before R.C.M. 911, which concerns assembly of a court-martial, and R.C.M. 912, which concerns voir dire.

martial, and R.C.M. 910 establishes the legal framework for determining the voluntariness and accuracy of those pleas. Accordingly, Appellant's claims that he failed to "knowingly" submit to a guilty plea inquiry conducted by the military judge, and that the judge erred in not assembling the court until after the entry of findings, are all without merit.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court